**AFFIRM; and Opinion Filed January 28, 2014.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-11-01728-CV

## IN THE INTEREST OF S.N.Z., A CHILD

**On Appeal from the 417th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 417-50064-06**

## OPINION

Before Justices Lang-Miers, Fillmore, and Brown[1]
Opinion by Justice Brown

The mother of S.N.Z. appeals from an order denying her counter-petition to modify the parent-child relationship. The trial court specifically denied Mother's request for standard visitation, leaving her with limited supervised visitation with S.N.Z., and modified the existing possession order to change the time of day the supervised visitation occurred. On appeal, Mother contends the visiting judge that presided over the case was disqualified and challenges the sufficiency of the evidence to support the continuation of the requirement that her periods of access and possession be supervised. We affirm the trial court's order.

---

[1] The Honorable Mary L. Murphy, Retired Justice, was a member of the panel at the time this case was submitted, but due to her resignation from this Court on June 7, 2013, she did not participate in deciding this case. She was replaced on the panel by Justice Ada E. Brown in accordance with the appellate rules. *See* TEX. R. APP. P. 41.1(a).

## Background

Appellees are S.N.Z.'s paternal aunt and uncle. S.N.Z.'s father is deceased. In January 2007, the parties signed a mediated settlement agreement, the terms of which were incorporated into a final order dated January 29, 2007.[2] The 2007 final order named appellees as permanent managing conservators of S.N.Z. and Mother as possessory conservator with five hours of supervised visitation with S.N.Z. on the first, third, and fifth Sunday of each month. The parties selected Mother's older daughter M.H. as the visitation supervisor. Mother was required to submit to drug testing, including random drug testing at the request of appellees, but she was not required to pay child support. Appellees agreed to telephone contact between S.N.Z. and Mother one night each week. The parties further agreed to attend family counseling sessions. The parties acknowledged that the agreement on conservatorship was in S.N.Z.'s best interest.

Appellees sought to modify the 2007 final order in June 2009, asking the court to remove the portion of the final order that prohibited them from traveling with S.N.Z. outside of the state without the written agreement of Mother. They also asked the court to render a possession order that provided "greater security" for S.N.Z. and modify Mother's periods of possession to exclude the fifth Sunday of each month. In an amended petition, appellees sought removal of the requirement for telephone access between Mother and S.N.Z.

Mother filed a response and counter-petition to modify. Mother sought to be named the sole managing conservator of S.N.Z. and terminate all conservatorship rights of appellees. She alleged that circumstances have materially changed because, among other things, appellees have denied her access to information about S.N.Z., denied her scheduled visitation and telephone

---

[2] The January 29, 2007 final order was not included in the record on appeal. The record, however, does include the mediated settlement agreement and related exhibits. Exhibit A to the mediated settlement agreement lists the specific terms to which the parties agreed. We rely on this document to the extent our exposition provides such background.

-2-

calls, removed S.N.Z. from the state without her permission, and refused to participate in counseling. She also alleged she believed appellees were "poisoning the child's mind" against her. She further alleged her physical and financial positions have improved to the point where she is fully capable and competent to care for S.N.Z. Mother amended her counter-petition, alleging in the alternative that in the event she is not awarded sole custody, the child's best interests would be served by restoring her visitation "to those normally referred to as 'standard visitation rights.'"

Before the start of the trial on January 17, 2012, Mother, acting pro se, objected to the assignment of the Honorable Don Jarvis as a visiting judge and argued that based on her objection, the judge lacked jurisdiction to hear the case. She also filed an emergency motion to dismiss and objection to the judge. The trial judge denied her motion, and the case proceeded to trial before the court.

Mother explained at trial that she was seeking more time with S.N.Z. and would allow S.N.Z. to remain living with appellees if she could receive the standard visitation afforded parents under the family code.[3] She presented the testimony of five witnesses in support of her contention that supervised visitation was no longer required. Her first two witnesses testified they had known Mother for four or five years and were aware of Mother's ongoing attempts to gain more access to her daughter. Both witnesses described Mother as a caring and loving person, who was upset she could not spend more time with S.N.Z. and be involved in her life. They testified Mother had told them about an incident that occurred when S.N.Z. was a baby where Mother broke her neck while catching S.N.Z. during a fall. They agreed this incident

---

[3] *See* TEX. FAM. CODE ANN. § 153.252 (West 2008) (rebuttable presumption in conservatorship suits that standard possession order provides reasonable minimum possession for parent and is in child's best interest).

showed that a person who saves her baby from a fall would not harm her child; rather, it showed Mother put the child's safety before her own health. The witnesses said they had never met S.N.Z., and one witness acknowledged that all the information she testified to about the case came from Mother.

Mother's ex-boyfriend also testified to the incident where Mother "saved her child," stating Mother "put her own health at risk to try and save her little girl." Mother's ex-boyfriend dated Mother for four years and was present for "a lot of supervised visits with various supervisors." He testified the visits were upbeat and positive and represented a normal, healthy interaction. He also testified Mother displayed "true motherly affection" for not only S.N.Z. but also for M.H. and M.H.'s children when they were present for the visits. He never witnessed any inappropriate behavior and questioned the need for supervised visitation.

Joanne Goodwin testified to her observations as a court-approved visitation supervisor. Goodwin also was one of Mother's personal friends and was not paid for supervising the visits. Goodwin supervised Mother's visits with S.N.Z. for about seven months. Goodwin said that at her first visit, S.N.Z. was sullen but as they got into the visit, she became lively, animated, and happy. According to Goodwin, the visits seemed to be "pretty fun loving" and Mother and S.N.Z. had normal mother/daughter exchanges. Goodwin described the last visit she supervised before the trial began. She said S.N.Z. had been away from Mother for a longer period of time and it took S.N.Z. a long time to "warm up" to her mother. Goodwin testified, however, that "in spite of the alienation," she could see a bond between Mother and S.N.Z. Goodwin did not see any danger in S.N.Z. spending more time with Mother without a supervisor.

Goodwin also testified that during the last visit, Mother asked S.N.Z. if she was aware of the upcoming trial. Goodwin heard S.N.Z. tell Mother that she did not want to be at the

-4-

proceedings. Goodwin admitted that she has heard Mother relay "factual statements" about appellees to S.N.Z., but she could not provide an example of what may have been said.

Goodwin further testified to an exchange between Mother and S.N.Z. during which S.N.Z. said she could not send a text message to Mother because she had been told by her uncle that she was not supposed to do so. Goodwin said S.N.Z. told Mother that her uncle checked her text messages each night and that S.N.Z. seemed afraid she would get in trouble if she sent Mother a text message.

Mother's final witness was Stephen Finstein, a licensed clinical social worker, family therapist, and sex-offender treatment provider. Mother hired Finstein to observe a home visit with S.N.Z. and perform various psychological tests on Mother to evaluate whether there would be a danger in permitting Mother to have unsupervised visitation. The tests assessed Mother's truthfulness and whether parenting is stressful for her. Finstein testified that based on his observations and testing, he recommended that Mother have unsupervised visitation with S.N.Z. Finstein admitted on cross-examination that he never interviewed S.N.Z. or M.H.; he received his information from his interview with Mother and documents she provided. He also agreed that if a child consistently reports she is being emotionally abused and requests protection from a person, then that is "something that should be looked into."

Mother testified she signed the mediated settlement agreement because she was told by the mediator that she "would never see [S.N.Z.] again if [she] didn't let her go live with [appellees]." And she clarified that she was asking the court only to increase her visitation rights because she was concerned about S.N.Z.'s emotional well-being. Mother denied "talking bad" about appellees to S.N.Z. but admitted to talking with S.N.Z. about the upcoming trial. Mother

-5-

thinks S.N.Z. should be in counseling and claimed she has been denied the counseling that the parties agreed to in the mediated settlement agreement.

Counsel for appellees played a tape recording of a phone message Mother left for appellees. Mother testified she was upset on that call because she thought appellees were putting M.H. in the middle of a disagreement over who was supposed to drive S.N.Z. to and from her visits. She stated in the call that if appellees wanted her to agree that they can take S.N.Z. out of the state then appellees must "agree to let [her] spend more time with [S.N.Z.], or otherwise, [Mother] ain't going for anything that you want." Mother said she was not using that as a "bargaining tool" and what she said on the message was not a threat.

S.N.Z.'s aunt testified that she does not want S.N.Z.'s visits with her mother to stop. But because there is stress in the visits, she wants the visits to remain supervised for the protection of S.N.Z. The aunt said S.N.Z. "also wants [the visits] to remain supervised" because a supervisor "will protect her from the things that her mother is saying to her that she feels uncomfortable with." S.N.Z. also has told her aunt that Mother is a "loose cannon at times" and that S.N.Z. wants "less time" with Mother. The aunt said the purpose for their petition to modify the existing order was to "tweak" the amount of visitation based on what S.N.Z. wanted.

The aunt has encouraged S.N.Z. to have telephone contact with Mother. She explained, however, that when it came time for the agreed weekly phone call, S.N.Z. did not want to participate because Mother "would cry and tell her that she just wants her back." This made S.N.Z. feel guilty for wanting to live with her aunt and uncle. The aunt said the weekly phone call caused a lot of emotional stress for S.N.Z., so she told S.N.Z. that she could call Mother when she wanted. She added that it would be "okay" with them if S.N.Z. wanted to call Mother. But they did not force it.

-6-

The uncle testified that they are not trying to terminate Mother's parental rights and agreed that Mother should have a relationship with S.N.Z. But they want to control the negativity and the "stone throwing" caused by Mother. The uncle explained that although they do not want to sever S.N.Z.'s relationship with Mother, it has been "very difficult" because S.N.Z. said "she wants to stop these visits and limit them to maybe once a month." He testified that based on what S.N.Z. has told him, he believes it is in S.N.Z.'s best interest to continue having the visits with Mother supervised and lessen the number of weekend visits with Mother. He also testified that if S.N.Z. does not want to spend time with Mother, they cannot push her to do it. The uncle emphasized that they have been "working on this" for six years and it has been a "battle." He also emphasized that M.H. stopped supervising the visits because "she doesn't want . . . the chaos."

M.H. had testified in an earlier proceeding related to the case. A transcript of that testimony was admitted into evidence. She testified she quit supervising the visits because she did not like being in the middle of "that confrontation" or the tension between Mother and appellees. She said that Mother was "sometimes argumentative" with her during the visits, which upset S.N.Z., and that Mother would want to "know stuff" that was going on with S.N.Z., including "stuff" S.N.Z. did not want to talk about. At times, she had a hard time stopping Mother from asking things that made S.N.Z. uncomfortable.

M.H. decided to stop supervising the visits after an argument with Mother on Thanksgiving in 2010. She did not remember the substance of the argument but recalled the argument upset S.N.Z., who left her house crying. M.H. described her relationship with Mother as "fair" and said that she and Mother "don't always see eye to eye." She has a good relationship with appellees and believes S.N.Z. is being properly cared for by appellees.

M.H. recounted the time when she was contacted by Child Protective Services to pick up S.N.Z. or she would be sent to foster care. Mother and S.N.Z. had been living in a homeless shelter. M.H. picked up S.N.Z. from CPS and then contacted appellees to tell them about the situation. During the related custody proceeding, M.H. explained to the judge that she was a single mom with two children and if S.N.Z. was not given back to Mother, then appellees "would be happy to take care of her." M.H. testified that Mother "hates" her because "it's [her] fault [S.N.Z.] is with [appellees]." She added that Mother is "very angry" with her because of "this situation with [S.N.Z.]." On one occasion, the police were called during a special visit M.H. supervised because Mother "threaten[ed] to kill" M.H. She knew that Mother was just upset about the situation and did not think Mother would do anything. Mother acknowledged she got into an argument with M.H. during the special visit with S.N.Z. and that the police were called but denied threatening to kill M.H. because she brought appellees into the situation.

M.H. also recounted the time when she went to live with Mother when she was a teenager. M.H. originally lived with her father, and without his permission, she "ran away" with Mother. M.H., her other sister, and Mother went to Hawaii for what was meant to be a vacation. But they ended up staying in Hawaii for a year and a half before they moved to Texas. While she was in Hawaii, M.H. performed as an exotic dancer with Mother. M.H. was fourteen years old at the time. Mother denied "stripping" with M.H. when they lived in Hawaii.

The trial court also heard testimony from Nancy Stark, who performed the social study for this case. As part of the social study, Stark met with S.N.Z., who told Stark that she wants to continue living with appellees and visiting her mother with supervised visits. Stark testified that S.N.Z. is a mature, well-spoken girl, who wants to leave the visits with Mother "exactly how it is." Stark said S.N.Z. does not want to be alone with Mother and is scared Mother will take her

-8-

away. Stark added that S.N.Z. feels Mother is critical of her and she has to take care of Mother's feelings because Mother is emotional. Mother did not cross-examine Stark.

After hearing testimony over two days and interviewing S.N.Z. in chambers, the trial judge denied Mother's request for standard visitation. He stated he's "stuck with what [S.N.Z.] says" and even though S.N.Z. "would be happier with one visitation" per month, he would keep the periods of possession "the same as it has been in the past." He also stated that this would be the order until S.N.Z. "thinks that she feels safe" with Mother. He did not elaborate on the factual basis for the findings or prepare written findings of fact and conclusions of law after Mother requested he do so. He signed an order dated February 20, 2012, denying Mother's requests for standard visitation and the removal of limited supervised visitation. The trial court ordered that Mother's access "shall remain the same as previously ordered" except that her visits will begin at 2:00 p.m. and end at 7:00 p.m. (visits under the previous order were from Noon to 5:00 p.m.).

Mother appealed. In her second issue on appeal, Mother complains of the trial judge's failure to issue written findings of fact and conclusions of law stating why he deviated from the standard possession order, as required by section 153.258 of the family code. *See* TEX. FAM. CODE ANN. § 153.258 (providing "in all cases in which possession of a child by a parent is contested, and the possession of the child varies from the standard possession order," on written or oral request, "the court shall state in the order the specific reasons for the variance from the standard order"). By order dated May 30, 2013, we sustained this issue, abated the appeal, and directed the trial judge to make supplemental findings of fact and conclusions of law that included the specific reasons for varying from the standard possession order. The trial judge

-9-

complied and transmitted his supplemental findings and conclusions to this Court in a supplemental clerk's record.

The trial judge recited that after seeing the evidence presented and the demeanor of the parties and witnesses, he "could not help but decide that the best interest of the child is served by naming [appellees] Managing Conservators and [Mother] as the Possessory Conservator of [S.N.Z.] with supervised visitation." He found there was "credible evidence of a history of past or present child neglect and abuse" by Mother directed against S.N.Z. and M.H. as well as evidence that Mother subjected S.N.Z. to "numerous episodes of embarrassing behavior" in front of S.N.Z.'s teachers and friends. He also found a standard possession order was not proper and that Mother's periods of possession deviated from a standard possession order for the following reasons:

a: History of neglecting and abusing the child, [S.N.Z.];

b: History of ignoring and disregarding court orders;

c: History of emotionally abusing [S.N.Z.] during visitations;

d: Legitimate fear of [Mother] removing or hiding the child from the jurisdiction of the State of Texas or United States[.]

He stated the possession order was "designed to protect the safety and well-being of [S.N.Z.]" and concluded that Mother was "entitled to supervised periods of possession with [S.N.Z.] under the terms and conditions set forth in the order."

Mother's second issue on appeal is now moot. *See Moore v. First Fin. Resolution Enters., Inc.*, 277 S.W.3d 510, 514 n.1 (Tex. App.—Dallas 2009, no pet.). In our June 26, 2013 order reinstating this appeal, we authorized Mother to file a supplemental brief in which she could challenge the trial court's written findings of fact and conclusions of law. Mother filed a supplemental brief, repeating the first issue she raised in her initial brief and adding a challenge

to the evidence supporting the trial judge's denial of her request for standard visitation. We will consider these issues below. Appellees have not filed an appellate brief or otherwise appeared in this appeal.

## Objection to Visiting Judge

Mother contends in her first issue that the 2012 final order is invalid because the Honorable Don Jarvis, a "visiting judge presiding over the 417th District Court of Collin County, Texas," was disqualified from presiding at trial under section 74.053 of the Texas Government Code after she filed her "Objection to Assigned Judge." *See* TEX. GOV'T CODE ANN. § 74.053(b) (West 2013). Section 74.053(b) provides that once a party files a timely objection to an assigned judge, "the judge shall not hear the case." *Id.*; *see also Lewis v. Leftwich*, 775 S.W.2d 848, 849–50 (Tex. App.—Dallas 1989, orig. proceeding). An objection to an assigned judge is timely if it is filed before the first hearing or trial, including pretrial hearings, over which the judge is to preside, without regard to the terms of the particular order under which the judge is assigned. TEX. GOV'T CODE ANN. § 74.053(c); *In re Canales*, 52 S.W.3d 698, 704 (Tex. 2001) (orig. proceeding); *Lewis*, 775 S.W.2d at 849. Conversely, an objection to an assigned judge is late if it is filed after the assigned judge makes any ruling in the case. *In re Canales*, 52 S.W.3d at 704; *Perkins v. Groff*, 936 S.W.2d 661, 666–67 (Tex. App.—Dallas 1996, writ denied).

Mother premises her disqualification argument on the timeliness of her objection. She argues her objection was timely because it "had already been on file for five days" before the trial began on January 17, and was made "both in writing and in open court," before any ruling in the matter was made. Yet the clerk's record shows Judge Jarvis presided in the case before Mother filed her objection. For example, Judge Jarvis signed an order dated July 1, 2011 denying Mother's motion to transfer venue. This ruling also precedes Mother's "Notice of

Objection to Judge Don Jarvis" filed on October 26, 2011. Mother further acknowledged on the record at the end of trial that Judge Jarvis had been involved with the case since February 2011. Thus, we conclude Mother's objection was not timely because it was filed after the assigned judge had heard and ruled on motions filed by her. *See* TEX. GOV'T CODE ANN. § 74.053(c); *In re Canales*, 52 S.W.3d at 704; *Perkins*, 936 S.W.2d at 667. We overrule her first issue.

### Sufficiency of the Evidence to Support Continued Supervised Visitation

In her supplemental brief, Mother contends the trial judge's refusal to modify the 2007 final order to allow her standard visitation was an abuse of discretion because there was no evidence or insufficient evidence to support the continuation of the requirement that her visits with S.N.Z. be supervised. She contends the only evidence to support the requirement that her visits be supervised is "inflammatory accusations" of counsel and "innuendo" about her past behavior.

#### *Legal Standards*

We review a trial judge's decision on a petition to modify under an abuse-of-discretion standard. *In re W.C.B.*, 337 S.W.3d 510, 513 (Tex. App.—Dallas 2011, no pet.); *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied). Under this standard, we look to whether the trial judge acted unreasonably; that is, did the trial judge act in an arbitrary manner or without reference to any guiding rules or principles. *In re W.C.B.*, 337 S.W.3d at 513. The abuse-of-discretion standard of review overlaps with traditional sufficiency standards of review in family law cases. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). As a result, legal and factual insufficiency challenges are not independent grounds for reversal, but instead constitute factors relevant to our assessment of whether the trial judge abused his discretion. *Id.*; *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied).

- 12 -

In determining whether a trial judge abused his discretion because the evidence is insufficient to support the decision, we first look to whether the judge had sufficient evidence upon which to exercise his discretion and then look to whether the judge erred in his application of that discretion. *Moroch*, 174 S.W.3d at 857. Our inquiry under the second question is based on the elicited evidence; we ask whether the trial judge made a reasonable decision. *Id.*

In a legal sufficiency review, we consider the evidence in the light most favorable to the court's order and indulge every reasonable inference that supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *In re S.E.K.*, 294 S.W.3d at 930. A trial judge does not abuse his discretion if some evidence of a substantial and probative character exists to support the decision. *In re S.E.K.*, 294 S.W.3d at 930. In a factual sufficiency review, we consider all the evidence supporting and contradicting the fact-finder's finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). The evidence is factually insufficient if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* The trial court is in the best position to observe the witnesses and their demeanor and, therefore, is given great latitude when determining the best interests of the child. *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.); *see also In re R.D.Y.*, 51 S.W.3d 314, 321 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (because trial court is in best position to observe credibility and personalities of witnesses, there is no abuse of discretion when court bases its decision on conflicting evidence).

### *Applicable Law*

Because Mother was seeking a modification of the 2007 final order—to have standard visitation with S.N.Z.—Mother bore the burden to establish the requirements of section 156.101 of the family code. *See* TEX. FAM. CODE ANN. § 156.101(a)(1)(A) (West Supp. 2012).

- 13 -

Specifically, Mother had to show that modification would be in the best interest of S.N.Z. and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since date of rendition of prior order. *Id.*[4] The best interest of the child "shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002 (West 2008); *Lenz*, 79 S.W.3d at 14. This means that for Mother to succeed on her request for standard, unsupervised visitation, she had to come forward with evidence concerning S.N.Z.'s best interest that has developed since the prior conservatorship order. If Mother fails to show a material and substantial change in circumstances, her petition to modify must be denied. *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Bates v. Tesar*, 81 S.W.3d 411, 421 (Tex. App.—El Paso 2002, no pet.); *see also Ogletree v. Crates*, 363 S.W.2d 431, 436 (Tex. 1963) ("[I]n the absence of materially changed conditions, the disturbing influence of constant re-litigation should be discouraged.").

To prove that the necessary change occurred, Mother must demonstrate what conditions existed at the time of the entry of the prior order and what material conditions have changed in the intervening period. *In re W.C.B.*, 337 S.W.3d at 514; *cf. T.A.B. v. W.L.B.*, 598 S.W.2d 936, 939 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.) (noting the requirement is that a change must be shown and any method of proof that does that satisfies the statutory requirement). Material changes may include (1) remarriage by a party, (2) poisoning of the child's mind by a party, (3) change in the home surroundings, (4) mistreatment of the child by a parent or step-

---

[4] Mother claims we should follow the holding in *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied), in which the Fort Worth Court of Appeals held that a showing of a "positive improvement" was required before custody may be awarded to the non-parent. Before section 156.101 was rewritten in 2001, a movant was required to show a material and substantial change in circumstances as well as positive improvement for the child. *See In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). The current version of the statute, however, no longer includes the requirement of "positive improvement" for the child. *See Lenz v. Lenz*, 79 S.W.3d 10, 12 n.1 (Tex. 2002). We conduct our analysis under the current version of section 156.101.

parent, and (5) a parent's becoming an improper person to exercise custody. *In re A.L.E.*, 279 S.W.3d at 428–29. In addition, "a course of conduct pursued by a managing conservator that hampers a child's opportunity to favorably associate with the other parent may suffice as grounds for redesignating managing conservators." *Arredondo v. Betancourt*, 383 S.W.3d 730, 735 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In deciding whether circumstances have materially and substantially changed, the trial judge is not confined to rigid or definite guidelines. *In re A.L.E.*, 279 S.W.3d at 428. Rather, the determination depends on the facts of the case and must be made according to the circumstances as they arise. *Id.*

In determining the best interest of a child, a court may consider, among other things, the desires of the child; the child's current and future emotional and physical needs; any emotional or physical danger to the child; the parental abilities of the individual seeking custody and her plans for the child; the stability of the home; acts or omissions by a parent tending to show the existing relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing factors used for determining best interest of the child). The focus of the analysis is on the best interest of the child, not the best interest of the parent. TEX. FAM. CODE ANN. § 156.101(a); *cf. id.* § 153.002.

*Analysis*

In challenging the sufficiency of the evidence supporting the trial judge's decision to deny her requested modification, Mother questions whether the trial judge gave proper consideration to S.N.Z.'s wishes and erroneously considered alleged improper conduct by Mother. She also asks whether the judge ignored Finstein's testimony that he saw no reason why Mother's visits with S.N.Z. should be supervised and the continuation of the supervision requirement was detrimental to her relationship with S.N.Z. Mother contends she presented

- 15 -

"substantial evidence" of her ability to be a loving and caring mother and that the "competent testimony" established she posed no danger to S.N.Z.

The witness testimony presented by Mother generally depicted her as a loving and caring mother, who wants to spend more time with S.N.Z. and is concerned about S.N.Z.'s emotional well-being. Yet two of the witnesses had never met S.N.Z. and therefore could not testify to Mother's interactions with S.N.Z. or whether those interactions were positive for S.N.Z. Goodwin testified she saw no danger in S.N.Z. spending more time with Mother unsupervised, but the basis for that testimony was that Mother should get more time with S.N.Z. so Mother could establish a more natural relationship with her. Goodwin explained that "everyone needs a mother figure in their life, a real mother figure who wants to be with the child." Similarly, the ex-boyfriend testified that Mother "has never shown [him] any reason" why her visits with S.N.Z. required supervision. But he did not explain why supervision was unnecessary other than the fact that Mother loved S.N.Z. and had been "fighting" for normal access to S.N.Z. since he had known her. Finally, Finstein testified that during a home visit with Mother and S.N.Z., he observed a normal, healthy interaction. He said that based on his observations and psychological testing of Mother, he did not see that Mother required supervised visitation with S.N.Z. Finstein thought that keeping a parent under supervised visitation for such a long period of time sends a "damaging message" to the child "if there really isn't anything wrong with that parent." Finstein admitted, however, that he never interviewed S.N.Z., so he did not know what S.N.Z. would have to say about Mother, positive or negative, and that everything he reviewed and analyzed for this case came from Mother.

Although Mother testified she would like to spend more time with S.N.Z., none of this testimony constitutes evidence of the necessary material and substantial change in circumstances

to justify a modification of the existing possession order. *See id.* § 156.101(a). Mother's arguments and the evidence she cites in support focus on the fact that she cares about S.N.Z. and wants more access to her. Indeed, throughout the underlying modification proceedings and in her brief on appeal, Mother maintained her only desire was to have regular visitation without the intrusion or expense of a supervisor such that she can develop a normal, parent-child relationship with her daughter. The focus of the analysis, however, is whether there is a material and substantial change in circumstances that would cause standard visitation to be in S.N.Z.'s best interest, not in the best interest of Mother. *Id.* § 156.101(a); *id.* § 153.002.

Mother also argues that the evidence established "a pattern of interference with her abilities" to develop a relationship with S.N.Z. and appellees had been "alienating her daughter from her." She alleged in her counter-petition and amended counter-petition that circumstances had materially changed because she believed appellees were "poisoning the child's mind" against her and therefore, it would be in S.N.Z.'s best interest to restore Mother's visitation to standard visitation. She states that attempts to alienate a child from a parent may be grounds for modification of custody, citing *Allen v. Mancini*, 170 S.W.3d 167, 171 (Tex. App.—Eastland 2005, pet. denied). Mother contends the record establishes that appellees "have frightened the child about calling or texting her mother, and that she is afraid that she will get in trouble for contacting her mother." She further contends the record is "replete with unfounded accusations and innuendo" about her past behavior, including behavior that occurred before S.N.Z. was born.

In *Allen*, the evidence that supported the trial court's finding of "extreme attempts to alienate [the father] from the child" causing a substantial interference with the child's relationship with the father consisted of specific testimony that the mother told the child her father did not love her, stole money, was going to jail, had kidnapped her, and that she should not

call him "Dad." *Id.* at 170. Additional testimony showed that the mother made visitation difficult and had called CPS on father, alleging that he abused and neglected the child. *Id.* That evidence supported a material and substantial change in circumstances warranting the requested modification by the father. *Id.* at 171.

No such evidence exists in this case. At best, there is conflicting evidence concerning S.N.Z.'s permission to send text messages to or call Mother. Goodwin testified she had heard that S.N.Z.'s uncle did not allow S.N.Z. to contact Mother using her cell phone. But the trial court also heard testimony from S.N.Z.'s aunt that she encouraged S.N.Z. to contact her mother and that she could do so anytime she wanted to; appellees just "don't force it." There is no abuse of discretion when a trial judge bases his decision on conflicting evidence. *See In re R.D.Y.*, 51 S.W.3d at 321. Further, unlike the circumstances in *Allen*, there is no evidence that appellees interfered with the child's relationship with Mother or acted to alienate Mother from S.N.Z. Appellees testified they did not want to stop S.N.Z.'s visits with Mother; they stated they just wanted the visits to continue to be supervised to protect S.N.Z. There also is nothing in the record to suggest appellees told S.N.Z. about any "alleged behavior" by Mother or made statements to S.N.Z. about Mother.

The modification statute's requirement that Mother, as the party seeking modification, establish a material and substantial change in circumstances is predicated upon the doctrine of res judicata as to the best interest of the child at the time of the original custody proceeding. *See Knowles v. Grimes*, 437 S.W.2d 816, 817 (Tex. 1969) ("A final judgment in a custody proceeding is res judicata of the best interests of a minor child as to conditions then existing."); *see also Bates*, 81 S.W.3d at 421 (noting that principle of res judicata is recognized in the family code's requirement that a party attempting to modify existing custody order must show

- 18 -

circumstances have materially and substantially changed since the time of the prior order). The requirement also is consistent with the policy to ensure stability for children and prevent constant litigation in child custody cases. *See In re A.L.E.*, 279 S.W.3d at 428 (quoting *Bates*, 81 S.W.3d at 426, and noting that "Texas law has imposed "'significant hurdles' before a conservatorship order may be modified"). Based on the circumstances at the time of the 2007 final order, the parties agreed that S.N.Z.'s interests would be served with Mother having five hours of supervised visitation on the first, third, and fifth Sunday of each month. After considering the evidence and the demeanor of the parties and witnesses during the modification proceeding, the trial judge determined that it was in S.N.Z.'s best interest to deny Mother's request for standard visitation. That is, the judge determined that appellees would continue to serve as the sole managing conservators of S.N.Z. and Mother's access to S.N.Z. as a possessory conservator would continue to be supervised. The trial judge specifically ordered that Mother's access to S.N.Z. was to "remain the same as previously ordered" in the 2007 final order except that the time of day her visits began and ended changed.

At the modification proceeding, appellees each testified that S.N.Z. wants less time with Mother and for the visits to remain supervised. They stated that supervised visitation was a way to control the stress of the visits for S.N.Z. and negativity from Mother. The judge also had before him the transcript of M.H.'s prior testimony in which M.H. testified she had a hard time stopping Mother from asking S.N.Z. things that made S.N.Z. feel uncomfortable. Further, the judge heard testimony about how the police had to be called during a special visit with S.N.Z. He also asked Mother questions about an instance where police were called because Mother showed up to S.N.Z.'s cheerleading competition.

Stark testified that in the process of preparing the home study for the case, she spent time with S.N.Z. and that S.N.Z. communicated she wants "to continue living where she is" and "to continue visiting her mother with supervised visits." Stark summarized her interview with S.N.Z.:

> [S.N.Z.] is a very mature young girl for her age. She's very well-spoken. She wants to leave it exactly how it is. She does not want to be alone with her mom. She's scared her mom will take her away. She feels her mom is critical of her and that [S.N.Z.] ends up being the adult and her mom ends up being the child. She feels like she has to take care of her mom's feelings. Her mom is emotional. Her mom gets upset with her. And she just wants to be a kid. She does not want to be the adult in this relationship.

Mother did not challenge Stark's testimony on cross-examination.

The trial judge conducted an in-chambers interview with S.N.Z., and the record reflects that this was not the first time he had spoken to the child. Before announcing his decision, the judge recounted that S.N.Z. told him that she was not being protected during the supervised visits. The judge heard that Mother questions S.N.Z. "all the time" and that S.N.Z. does not visualize her visits with Mother the same way as Mother.

The trial court was in the best position to observe the demeanor and personalities of the witnesses, including Mother, who represented herself at trial, and could feel the forces, powers, and influences that cannot be discerned by merely reading the record. *Bates*, 81 S.W.3d at 424. After reviewing the record, we conclude Mother failed to come forward with evidence that her requested modification of visitation would be in S.N.Z.'s best interest and that circumstances have materially and substantially changed since the prior conservatorship order. Thus, Mother did not meet her burden under section 156.101. We also conclude that the trial judge had sufficient evidence upon which to determine that maintaining the conservatorship as "previously ordered" was still in S.N.Z.'s best interest and did not err in the application of that discretion.

-20-

*See In re S.E.K.*, 294 S.W.3d at 930 (requiring some evidence of a substantial and probative character to support the trial judge's decision as to child's best interest). Thus, based on the elicited evidence, the trial judge made a reasonable decision when he denied Mother's request for standard, unsupervised visitation. *Moroch*, 174 S.W.3d at 857. Accordingly, we overrule Mother's challenge to the sufficiency of the evidence raised in her supplemental brief.

We affirm the trial court's modification order.

/Ada Brown/
ADA BROWN
JUSTICE

111728F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF S.N.Z., A CHILD,

No. 05-11-01728-CV    V.

On Appeal from the 417th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 417-50064-06.
Opinion delivered by Justice Brown.
Justices Lang-Miers and Fillmore
participating.

In accordance with this Court's opinion of this date, the trial court's order is **AFFIRMED**. It is **ORDERED** that appellees Todd and Karri Zeiler recover their costs of this appeal from appellant Teri Lyn Zeiler.

Judgment entered this 28th day of January, 2014.


/Ada Brown/
_____
ADA BROWN
JUSTICE

- 22 -