# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00141-CV

---

### Amanda Hoffman, Appellant

### v.

### Cody R. Hoffman, Appellee

---

**FROM THE 169TH DISTRICT COURT OF BELL COUNTY**
**NO. 289022 01, THE HONORABLE CARI L. STARRITT-BURNETT, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Amanda Hoffman challenges the district court's final order, rendered after a jury trial, that granted Cody R. Hoffman the right to designate the primary residence of their child, L.H.[1]  Amanda contends that the district court abused its discretion by (1) making this modification without legally and factually sufficient evidence of a material and substantial change since the rendition of Amanda and Cody's divorce decree and (2) granting Cody the right to designate L.H.'s primary residence instead of enforcing the parties' Rule 11 agreement.  We will affirm the district court's final order.

---

[1]  We refer to the parties and Cody's second wife by their first names because of their shared surname.  We refer to the children by their initials.

BACKGROUND

On March 23, 2018, the district court signed Amanda and Cody's agreed final divorce decree and named them joint managing conservators of their child, L.H. The decree granted Amanda the exclusive right to designate L.H.'s primary residence without regard to geographic location. Under the terms of a standard possession order in the decree, Cody received the right to possession of L.H. on the first, third, and fifth weekends of each month with extended possession in the summertime.

Sometime before the divorce, when L.H. was 1½ years old, Amanda and Cody separated. Amanda and her then-boyfriend,[2] along with L.H. and Amanda's older child, K.S., moved to North Carolina, where Amanda's relatives lived. While in North Carolina, Amanda gave birth to a third child, M.T.[3] Meanwhile, Cody remained in Texas. He married his second wife, Tara Hoffman, in 2019.

**Colorado CPS incident**

In May 2020, Amanda and another boyfriend, Glendon McFarland, along with L.H., K.S, and M.T., moved from North Carolina to Colorado, seeking better educational opportunities for her children and better employment opportunities for her. On November 19, 2020, Amanda went to work and left McFarland to watch the children, as she had done a few times. McFarland later called Amanda at work and reported that two-year-old M.T. had fallen down the stairs. When he called, an ambulance was arriving. M.T. was nonresponsive. He was transported to a hospital, where he remained about a month because of a traumatic brain injury,

---

[2] This may have been Benjamin Trujillo. The record indicates that Amanda's boyfriend at the time was not the same as the ones she had later.

[3] K.S. and M.T. are not Cody's children.

including a skull fracture and subdural hematoma that were ruled "nonaccidental."[4] While hospitalized, M.T.'s previous unexplained wrist fracture was discovered, as well as multiple bruises on his body in different stages of healing.

On the evening of M.T.'s November 19, 2020 injury, the Weld County Department of Human Services, a child-protective services (CPS) agency, obtained an emergency order from a Colorado district court for the immediate temporary removal of L.H., K.S., and M.T. from the home. The court found that "continuing the children's place of residence or in the care and custody of the person responsible for the children's care and custody would present a danger to the children's life or health in the reasonably foreseeable future," and granted temporary legal custody of L.H. to Cody. CPS later issued a report noting its concern about Amanda's "failure to protect" and that "[p]ast trauma[]s were not under Glen [McFarland]'s supervision." While M.T. remained hospitalized, L.H. went to reside with Cody and Tara in Texas.

**Rule 11 agreement**

On December 8, 2020, after Cody filed an application for a protective order against Amanda in a Bell County, Texas district court, Amanda and Cody signed a Rule 11 agreement that the court also signed and filed. The first item in the "Rule 11-Temporary Orders" agreement stated that Cody "shall have the right to designate residence in Texas so long as the Child Protective Services Case is open in Colorado." In the underlying trial, Amanda testified that her understanding of the Rule 11 agreement was that L.H. would be returned to her once the Colorado CPS investigation closed. Cody testified that his understanding of the Rule 11

---

[4] L.H. was in the house when M.T. was injured, but it is unclear from the record whether L.H. saw what happened.

3

agreement was that they would have to return to court after the case had closed if there were any change in who had the right to designate residence.

In April 2021, Amanda told Cody that the Colorado CPS case was getting ready to close, that her supervised-visitation restriction was going to be lifted soon, and that she wanted Cody to return L.H. to stay with her other children at her aunt's home in North Carolina. Cody declined Amanda's request to return L.H. while the Colorado CPS case was still open.

The Colorado district court signed an "Amended Order Dismissing [the CPS] Action" on August 31, 2021.[5] The court stated that "based on the recommendations of the caseworker and Guardian ad Litem and the record in this matter, it is in the best interests of the subject children [K.S. and M.T.] that the dependency or neglect action be dismissed." The order relieved CPS of its temporary legal custody of K.S. and M.T. Cody testified that L.H. was dropped from the Colorado CPS case after being placed in Cody's custody. As soon as she received the amended dismissal order, Amanda emailed a copy to Cody's attorney.

**IHOP incident**

Shortly after issuance of the dismissal order, Amanda; her then-boyfriend Ralph Bamcklow; K.S.; and M.T. went to Texas to see L.H. for his birthday weekend. The day before L.H.'s birthday, Amanda suggested meeting at an IHOP for breakfast. Cody told Amanda that he had to work, so Tara would take L.H. to the restaurant. Tara and Amanda had never met in person, and Tara brought Cody's longtime friend Roman Guzman, with her. Shortly before everyone finished breakfast, Amanda asked Tara if it would be ok to take the children to a nearby park. Tara agreed. Amanda testified that after walking through the parking lot, all three

---

[5] The record does not contain a dismissal order preceding this "amended" one. The order did not specify whether the Colorado CPS's concerns were ruled out.

children got into the back seat of her car, and Tara became upset because she thought Amanda was allowed only supervised visitation with L.H. and thus could not drive him to the park. Amanda testified that the children were excited to go to the park and wanted to ride together, but Guzman and Tara put their hands on the car door and prevented it from being shut until police arrived at the scene.

Tara recorded some of this incident with her phone, and that video was admitted into evidence. The six-minute video depicts a car door being held open by Guzman's outstretched arm; L.H. crying and asking multiple times, "Let me out of the car"; Amanda hunching between the open car door and the back seat while leaving a voicemail about the event to her attorney "Jessica," and telling L.H. to stop shouting, calm down, and that he can get out of the car when police arrive; Cody stating by speaker on Tara's phone that he is "going to break the fucking [car] window when I get there," disputing Amanda's understanding of their Rule 11 agreement, calling her a "fucking idiot" and a "dumbass," and telling her to "get out of the goddamn way" when he arrived at the scene. The video ends shortly after Tara states, "Cop's here."

Tara testified that at the time of the IHOP incident, she thought Amanda was still restricted to supervised visitation "[b]ecause there was an open CPS case" and was unaware of the August 31, 2021 dismissal order. Tara testified that Amanda "shoved" L.H. into the back seat of the car with his two brothers, that K.S. was hitting L.H. while they were in the car, and that "Amanda was grabbing [L.H.']s arms and trying to keep him in the car." Cody testified that the responding officer spoke with L.H. and that no charges were filed as a result of the incident.

5

**L.H.'s disclosures to therapists**

L.H. was still discussing this incident two and a half years later in his psychological evaluation with therapist Dr. John Gould. According to Dr. Gould's notes, which were admitted into evidence at trial, L.H. stated that he "wanted his mother to be arrested for trying to kidnap him when she was taking him to IHOP for his birthday."

Records from L.H.'s first therapist after his parents' divorce, Dr. Genna Viviona, were also admitted into evidence. According to these records, L.H. told Dr. Viviona that K.S. "has hurt him and scares him" and that he is "afraid to go back there." L.H. also said that he was "tired of police officers showing up to our house." He "expressed a great deal of anger about bio mom in N.C. trying to make him come back." He "acted out being kidnapped, tied up, and given a shot to go to sleep." L.H. stated that he "does not want to return to bio mom," that he "was scared when [he was] with bio mom because he was afraid she would not let him come home to Texas," and that "he does not want to go to see bio mom because they treat him bad there." In another session, L.H. "told this therapist about a bump on his head that he got from being hit by bio mom and her ex[-]boyfriend." L.H. saw Dr. Viviona until she disclosed that the counselors in her office do not make court appearances.

L.H. then began therapy with Elizabeth Brothers at STARRY for about a year. She testified about her sessions with L.H., including her notes that he: "verbalized feeling sad this week because he didn't want to go back to bio mother's home," "indicated mother does not feed him during visitations," "verbalized feeling ignored when telling mother he wanted to live in Killeen," "expressed frustration over mother advising him to say that he wants to stay with her via recording," and reported that mother had pushed him to the ground and dragged him by the leg along the floor. Therapist Brothers also testified that as a mandatory reporter, she had called

CPS in North Carolina after L.H. "verbalized biological mom kicks, punches, and hits [him] all over [his] body." He "demonstrated with a doll during session and proceeded to punch the doll with a closed fist all over doll's body and used [an] open hand to slap the doll's face." L.H. further stated that "she hurt me in other places, but I don't remember where." When Therapist Brothers reminded L.H. about the importance of being truthful, he "showed [a] bruise on right upper arm that [he] reported was from brother hitting him." Notes from Therapist Brothers's sessions with L.H. were admitted into evidence.

**Filing of petition seeking modification and issuance of temporary orders**

On December 14, 2021, Cody filed a petition to modify the parent-child relationship in the underlying suit, seeking appointment as the person with the exclusive right to designate L.H.'s primary residence and appointment as L.H.'s sole managing conservator with Amanda as possessory conservator. Cody's petition alleged that "[p]receding the filing of this suit, [Amanda] has engaged in a history or pattern of child abuse." He requested that Amanda have supervised visitation, progressing through steps to a standard possession order with travel restrictions, and restrictions against having a paramour around L.H. during the visitation.

The district court signed temporary orders on June 16, 2022, appointing Amanda and Cody as L.H.'s joint managing conservators and granting Cody the exclusive right to designate L.H.'s primary residence. Further, the temporary orders recited that Amanda "shall have supervised visitation whenever there is an open Child Protective Services investigation or case open" and that "[w]hen the case is closed, Amanda Gail Stevens Hoffman must provide proof of closure to Cody Hoffman by and through their respective attorneys." Amanda was

7

granted possession of L.H. on the first, third, and fifth weekend of every month, plus possession during L.H.'s spring vacation and for 42 days during the summer.

Before trial Amanda filed her proposed disposition of final issues, requesting that the parties be named joint managing conservators and that she be awarded the right to determine L.H.'s primary residence within North Carolina. She further requested that Cody be awarded a standard possession schedule for parents living over 100 miles from the child's residence.

The case proceeded to a week-long trial, after which the jury found that (1) the circumstances of L.H., Cody, or Amanda had "materially and substantially changed since March 26, 2018," and (2) Cody should be designated as the person with the right to determine L.H.'s primary residence. The district court signed its final order on December 22, 2023, appointing Amanda and Cody as L.H.'s joint managing conservators. Additionally, the final order provided that with 14 days' notice to Cody preceding a designated weekend, Amanda "shall have the right to possession of [L.H.] not more than one weekend per month, of [her] choice, beginning at 6 p.m. on Friday and ending at 6 p.m. on Sunday," along with 14 days of possession during L.H.'s summer vacation.

Amanda filed a combined "Motion for New Trial and Motion JNOV," which the district court denied. She also requested findings of fact and conclusions of law "on any issues of fact or law resolved by the court and not before the jury, including but not limited to, resolutions on the language of the final decree." The district court issued its findings, including:

- Parties agree to submit charge with "Joint Managing Conservators." So the only issue on jury charge is— 1. change of circumstances? 2. should dad be appointed Sole Managing Conservator? But attorneys agreed to submit to jury with Joint Managing Conservators.

- The Court/Jury found that Cody Hoffman proved that the circumstances of [L.H.], Amanda Hoffman and/or Cody Hoffman have materially and substantially changed since the prior controlling order in March 26, 2018; and

8

- The Court/Jury found that appointing Cody Hoffman the JMC with the right to determine the domicile/ primary residence would be in the best interest of the child.

This appeal followed.

## DISCUSSION

### Evidence supporting modification

Amanda's first issue contends that the district court abused its discretion when it modified the parties' divorce decree by granting Cody the right to designate L.H.'s primary residence without legally and factually sufficient evidence of a material and substantial change since the signing of the decree. A court may make such modification if it would be in the child's best interest, and if the circumstances of the child, a conservator, or another party affected by the order have materially and substantially changed since the date of rendition of the order. Tex. Fam. Code § 156.101(a)(1)(A). As the party seeking modification of the divorce decree, Cody had the burden to present evidence of that material and substantial change in circumstances. *See In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied).

We review a trial court's modification order under an abuse-of-discretion standard. *In re J.R.D.*, 169 S.W.3d 740, 742–43 (Tex. App.—Austin 2005, pet. denied). "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (internal citation omitted). Under the abuse-of-discretion standard, issues concerning the legal and factual sufficiency of the evidence are not independent grounds of error but relevant factors in assessing whether the trial court abused its discretion. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). When some evidence of

9

a substantive and probative character exists to support the trial court's decision, there is no abuse of discretion. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

Amanda points out that Cody's pleadings sought modification based on the allegation that "[p]receding the filing of this suit, [Amanda] has engaged in a history or pattern of child abuse." She argues that "the basis for Cody's contention that a material [and] substantial change had transpired [was] a Colorado CPS investigation, [which] was summarily dismissed by a Colorado district court." Relying on our opinion in *Warren v. Ulatoski*, No. 03-15-00380-CV, 2016 WL 4269999 (Tex. App.—Austin Aug. 11, 2016, pet. denied) (mem. op.), Amanda further argues that the Texas district court "abused its discretion when it entered a custody modification based on a rejected allegation of abuse." *See id.* at *5 (noting that only change in circumstances mother alleged was that father was being investigated for his ex-girlfriend's sexual-assault accusation, which police and Department believed was groundless and similar to ex-girlfriend's prior baseless accusations).

However, Amanda's argument assumes that the only basis for the abuse allegation was the Colorado CPS investigation. The jury heard evidence that during therapy sessions, L.H. reported that Amanda hit him causing a bump on his head, did not feed him during visitations, and had pushed him to the ground and dragged him by the leg along the floor. L.H.'s therapist Brothers called CPS in North Carolina after L.H. "verbalized biological mom kicks, punches, and hits [him] all over [his] body," as he "demonstrated with a doll during session," which he punched "with a closed fist all over doll's body and used [an] open hand to slap the doll's face." L.H. stated that "she hurt me in other places, but I don't remember where." When Therapist Brothers reminded L.H. about the importance of being truthful, he "showed [a] bruise on right upper arm that [he] reported was from brother hitting him." Additionally, Amanda's other child,

10

M.T., sustained past injuries—including an unexplained wrist fracture and multiple bruises on his body in different stages of healing—and the Colorado CPS noted that "[p]ast trauma[]s were not under Glen [McFarland]'s supervision."

This constituted some evidence of a substantive and probative character that supported the district court's Final Order in Suit to Modify Parent Child Relationship, the allegations in Cody's pleadings, and the jury's verdict. *See In re L.C.L.*, 396 S.W.3d 712, 717 (Tex. App.—Dallas 2013, no pet.) (noting that single act of violence or abuse can constitute "history" of physical abuse justifying modification in suit affecting parent-child relationship); *Echols*, 85 S.W.3d at 477 (explaining that jury's determination must be upheld if any probative evidence supports it). Thus, we overrule Amanda's first issue.

**Enforcement of Rule 11 agreement**

Next, Amanda contends that the district court abused its discretion by granting Cody the right to designate L.H.'s primary residence instead of enforcing their Rule 11 agreement. She argues that she and Cody "agreed that, pending the successful closure of the Colorado CPS case, the right to designate the primary residence of L.H. would return to [her]." She also argues that this agreement removed the determination of primary residence from the hands of the district court and made the determination contingent on the outcome of the Colorado CPS case. The evidence at trial showed that Amanda and Cody had different understandings about the effect of their December 8, 2020 Rule 11 agreement.

However, as Cody notes, Amanda never filed a motion asking the district court to enforce that Rule 11 agreement. Cody contends that Amanda's inaction failed to preserve her

11

Rule 11 issue for appellate review. Notably, Amanda's reply brief fails to address this lack-of-preservation argument.

To preserve an issue for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion with sufficient specificity to make the trial court aware of the complaint, and show an express or implicit ruling, or a refusal to rule and objection to that refusal. Tex. R. App. P. 33.1(a)(1)-(2). A party fails to preserve a complaint about the lack of enforcement of a Rule 11 agreement if the record does not show that the Rule 11 agreement was presented to the trial court for enforcement and that the trial court refused to enforce it. *See, e.g.*, *Jones v. Uribe*, 695 S.W.3d 1, 13 (Tex. App.—Amarillo 2024, pet. denied) (noting that party complaining about Rule 11 violation "did not provide the court with sufficient notice or obtain a ruling on the issue of which he now complains"); *Texas Tax Sols., LLC v. City of El Paso*, 593 S.W.3d 903, 913 (Tex. App.—El Paso 2019, no pet.) (concluding that party waived complaint that trial court refused to enforce valid Rule 11 agreement because record did not show that Rule 11 agreement was presented to trial court for enforcement or that trial court refused to enforce it); *Rammah v. Abdeljaber*, 235 S.W.3d 269, 273 (Tex. App.—Dallas 2007, no pet.) (concluding that party waived complaint that trial court refused to enforce valid Rule 11 agreement because he failed "to move the trial court to enforce the Rule 11 agreement 'with sufficient specificity' and to obtain a ruling on that motion").

No ruling was requested or received from the district court during trial about the December 8, 2020 Rule 11 agreement that Amanda contends was determinative as to the issue of L.H.'s primary residence. Thus, we agree with Cody that Amanda failed to preserve her complaint that the district court abused its discretion by not enforcing that agreement. *See* Tex.

12

R. App. P. 33.1(a)(1)-(2); *Texas Tax Sols.*, 593 S.W.3d at 913; *Rammah*, 235 S.W.3d at 273.  We overrule Amanda's second issue.

## **CONCLUSION**

Having overruled both of Amanda's appellate issues, we affirm the district court's Final Order in Suit to Modify Parent Child Relationship.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   January 23, 2025