**AFFIRM; and Opinion Filed November 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-17-00722-CV
_____

## IN THE INTEREST OF R.R.G., A CHILD

**On Appeal from the 254th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF13-01163**

# MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Lang-Miers

The trial court rendered a final decree of divorce between the parties. In seven issues, appellant Wife challenges the trial court's property division and denial of her motion for continuance. We affirm the trial court's judgment.

### BACKGROUND[1]

The parties were married on September 28, 2003. Wife filed an original petition for divorce on January 23, 2013. Husband filed a counter-petition on March 11, 2013.

_____

[1] On June 19, 2014, the trial court ordered that all documents bearing the trial court's cause number DF13-01163 "be and hereby are sealed, except those documents that are required by law to be recorded in the minutes of the Court." Accordingly, the clerk's and reporter's records were filed in this Court under seal. As we noted in *In re C.W.W.*, No. 05-15-00960-CV, 2016 WL 3548036, at *1 n.1 (Tex. App.—Dallas Jun. 28, 2016, no pet.) (mem. op.), "[p]lacing critical parts of an appellate record under seal potentially complicates our opinions because by statute and rule we must decide each case with a publicly released written opinion describing the case and explaining our decisions." *See* TEX. R. APP. P. 47.3 (all opinions are open to the public and must be made available to public reporting services); TEX. GOV'T CODE ANN. § 552.022(a)(12) ("final opinions, including concurring and dissenting opinions, and orders issued in the adjudication of cases" are "public information"); TEX. R. CIV. P. 76a.1 ("No court order or opinion issued in the adjudication of a case may be sealed."). We cannot decide the issues presented by the parties without reviewing the trial court's rulings and related evidence in the confidential record. The parties did not file their briefs under seal; consequently, we rely on their disclosure of otherwise confidential portions of the record as a guide in our discussion of the issues, and otherwise make "every effort to preserve the confidentiality of the information the parties have designated as confidential." *MasterGuard L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 371 Tex. App.—Dallas 2013, no pet.).

Wife's original counsel filed a motion to withdraw from her representation on February 7, 2014. The trial court granted the motion by order dated February 19, 2014. On April 3, 2014, Wife, now represented by Mark Nacol, filed a motion for continuance of the May 20, 2014 trial setting. The court granted the motion and reset the trial for October 20, 2014. On September 3, 2014, Wife moved for continuance of the October setting. The appellate record does not contain the trial court's order on this motion, but does contain Wife's subsequent motion for continuance of a June 1, 2015 trial setting. On June 19, 2015, the parties filed their Rule 11 agreement "to use Judge Franc[e]s Harris as a hired judge for all matters in controversy." On October 14, 2015, the trial court signed an agreed order appointing Judge Harris to serve as a private judge, to "preside over these proceedings until a final and appealable judgment or order is rendered." The trial court's findings of fact and conclusions of law reflect that a November 15, 2016 trial setting "was agreed to by the parties and their attorneys when set by the Court."

Nacol moved to withdraw as Wife's counsel on October 3, 2016, six weeks before the November 15 trial setting. In support of his motion, he stated:

> Good cause exists for withdrawal of Mark A. Nacol as counsel, in that circumstances have developed which would hinder continued effective litigation of the case and [Wife] engages in conduct which renders it unreasonably difficult for Mark A. Nacol to effectively carry out employment. Petitioner has also not complied with the terms and conditions of her attorney-client contact [sic]. Mark A. Nacol would further respectfully show the Court that the continued representation of the client will result in an unreasonable and significant financial burden on Mark A. Nacol . . . .

The trial court[2] held a hearing on the motion on October 20, 2016. The appellate record does not include a reporter's record of this hearing. The trial court granted the motion on October 25, 2016, finding that "good cause exists for the mandatory withdrawal of Mark A. Nacol as counsel." The trial court's October 25, 2016 order also provides:

---

[2] For all actions and proceedings after October 14, 2015, our references to "the trial court" are references to Judge Harris. *See* TEX. GOV'T CODE ANN. §§ 74.052 *et seq.* (Assignment of Judges). The agreed order appointing Judge Harris recites that it is pursuant to section 74.055 of the government code.

–2–

Trial By Judge—November 15-17, 2016, and all parties were advised that . . . there would be no further continuances given as a result of the withdrawal of counsel, and that all discovery deadlines have passed, as well as the deadline to add additional parties and to amend pleading. . . .The Court further finds that it was represented that upon the demand of [Wife], [Wife's] entire file was released to her on October 7, 2016.

Trial commenced on November 15, 2016 before Judge Harris. The court heard Wife's motion for continuance and Husband's response, including Wife's testimony. The trial court denied the motion for continuance. The court then heard a motion to intervene by Husband's former counsel, including related testimony by Nina Valdez on the intervenor's behalf. After Valdez's testimony, the trial court recessed the trial, with the following admonishments to the parties and counsel:

Now, I have carefully considered what I am about to do. The Motion for Continuance is denied. We have begun trial. We are in trial. We are not going to be doing any more discovery. We are not going to be doing any more document production. We are done. We are in trial.

However, [Wife], this is your last life boat from me. I am going—not continue this case. That ship has sailed. But I will recess further testimony in this case in order to allow you to either organize your materials and properly present and represent yourself or for you to retain counsel. . . .

We are in trial. We've started trial.

I want everybody here to understand and I want the order to reflect no more discovery . . . . We are going to trial on the material that has been produced in whatever semblance and shape that it has been produced. . . .

And I will recess, but not continue this case, until February 13th, 14th, 15th, and 16th, which is four full days of trial.[3]

The trial court also signed an order on November 15, 2016, denying Wife's motion for continuance. The court ruled,

IT IS ORDERED that the relief sought in [Wife's] Motions for Continuance are DENIED. [T]estimony was taken after the Court called this matter for trial and the final trial on the merits was begun Nov. 15, 2016. After testimony was taken under

---

[3] The reporter's record from November 15, 2016, is included in the appellate record as Respondent's Exhibit 2. Exhibit 2 contains its own exhibits, including the trial court's October 25, 2016 Order on Nacol's motion to withdraw as Wife's counsel and the November 15, 2016 Order on Wife's motion for continuance.

oath the Court on its own motion recessed the continuation of the trial to February 13, 14, 15, 16 2017 and orders no further pretrial hearings, discovery or other matters that are not properly motions that should occur prior to trial on the merits will be heard or scheduled.

On January 27, 2017, Donald E. Godwin and the law firm of Godwin Bowman & Martinez PC filed a "notice of limited scope entry of appearance" for Wife. Godwin notified the court that his appearance in the case "shall be limited in scope to the following matters: the preparation, filing, and presentation at hearing of Petitioner's Motion for Continuance of Resumption of Trial." The notice was accompanied by Wife's motion for continuance "for one hundred twenty (120) days but no less than ninety (90) days, to provide Petitioner the requisite due process and equitable right to prepare for trial." Wife argued that she had not been able to retain counsel to represent her at trial. The trial court denied Wife's motion, and trial resumed on February 13, 2017. Wife represented herself.

After the trial, the trial court issued a memorandum ruling. The trial court rendered a final decree of divorce on June 19, 2017, after overruling Wife's objections to the decree. The trial court also made findings of fact and conclusions of law on July 31, 2017. This appeal followed.

Wife, represented by appellate counsel, challenges the property division and the trial court's denial of her motion for continuance. The parties do not challenge the decree's provisions regarding R.R.G., their child.

STANDARDS OF REVIEW

We review the denial of a motion for continuance under an abuse of discretion standard. *Miller v. Prosperity Bank, N.A.*, 239 S.W.3d 440, 442 (Tex. App.—Dallas 2007, no pet.). We also review the trial court's rulings dividing the parties' property for abuse of discretion. *In re Marriage of C.A.S. and D.P.S.*, 405 S.W.3d 373, 382 (Tex. App.—Dallas 2013, no pet.). A trial court abuses its discretion when it acts "without reference to guiding rules or principles; in other words, whether

the act was arbitrary or unreasonable." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

A trial court's findings are reviewable for legal and factual sufficiency of the evidence supporting them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). In family law cases, the abuse-of-discretion standard of review overlaps with the traditional sufficiency standards of review; as a result, insufficiency of the evidence is not an independent ground of reversible error, but instead constitutes a factor relevant to our assessment of whether the trial court abused its discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). To determine whether the trial court abused its discretion we consider whether the trial court (i) had sufficient evidence upon which to exercise its discretion and (ii) erred in its exercise of that discretion. *Id.* We conduct the applicable sufficiency review with regard to the first question. *Id.* We then proceed to determine whether, based on the elicited evidence, the trial court's decision "was neither arbitrary nor unreasonable." *Moroch*, 174 S.W.3d at 857. A trial court does not abuse its discretion if it bases its decision on conflicting evidence as long as there is some evidence of a substantive and probative character to support the decision. *In re S.N.Z.*, 421 S.W.3d 899, 911 (Tex. App.—Dallas 2014, pet. denied); *Moroch*, 174 S.W.3d at 857. The trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied).

When reviewing an alleged property characterization error, we must determine whether the trial court's finding is supported by clear and convincing evidence and whether the characterization error, if established, was an abuse of discretion. *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied). We must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion in dividing marital property. *Sink v. Sink*, 364 S.W.3d

340, 343 (Tex. App.—Dallas 2012, no pet.). We will reverse the ruling of the trial court only if the record demonstrates that the trial court clearly abused its discretion, and the error materially affected the just and right division of the community estate. *Id.*

When the burden of proof at trial is by clear and convincing evidence, we apply a higher standard of legal and factual sufficiency review. *Id.* at 344. Clear and convincing evidence is defined as that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *Sink*, 364 S.W.3d at 344. In reviewing the evidence for legal sufficiency, we look at all the evidence in the light most favorable to the judgment to determine if the trier of fact could reasonably have formed a firm belief or conviction that its finding was true. *See Moroch,* 174 S.W.3d at 858. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* In reviewing the evidence for factual sufficiency, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the record, a fact finder could reasonably form a firm conviction or belief that the allegations in the petition were proven. *Sink*, 364 S.W.3d at 344.

## DISCUSSION

We consider Wife's fourth issue challenging the trial court's denial of her motion for continuance before turning to her issues complaining of the property division.

**1. Denial of Continuance**

Wife complains the trial court abused its discretion denying her motion for continuance because (1) the trial court permitted her attorney to withdraw 21 days before the November 15, 2016 trial setting; and (2) her available funds for hiring new counsel were depleted. Wife argues

the trial court committed fundamental error because she "had to appear *pro se* and represent herself at trial."

The trial court made the following findings relevant to Wife's motion for continuance:

4. The Court finds that after numerous temporary orders and discovery hearings, [Wife's] previous counsel and expert acknowledged that [Husband] produced virtually every document related to the community estate and his separate estate that was requested by [Wife]. Excluding some rebuttal evidence, the Court finds that every document used at trial by [Husband] had been produced to [Wife] and her team of attorneys and experts, beginning in 2013.

5. The Court finds that this matter was filed by [Wife] on January 21, 2013, and has been set for trial ten (10) separate times, the first being January 22, 2014. [Wife] was represented by counsel and had retained experts every time the case was set for trial, and the November 15, 2016 trial setting was agreed to by the parties and their attorneys when set by the Court. The[re] were six motions for continuances filed by various attorneys for [Wife] or [Wife].

6. The Court finds that a conflict between [Wife] and her attorney escalated to the point that her attorney, Mark Nacol, filed a motion to withdraw on October 3, 2016, alleging that circumstances developed which hindered continued effective litigation of the case and that [Wife] engaged in conduct which rendered it unreasonably difficult to effectively carry out representation. [Wife] retrieved her file from Mark Nacol on October 7, 2016, and the attorney's formal withdrawal followed. The Court further finds that this was the second time that the intentional actions of [Wife] caused and resulted in the mandatory withdrawal of her counsel, the first being Ron Massingill three months before the second trial setting in February 2014.

7. The Court finds the case proceeded to trial on November 15, 2016 with the direct testimony of Nina Valdez on the sole issue of a Plea in Intervention filed by Rose Walker, LP to enforce the payment of attorney fees against [Husband]. The Court recessed the trial after the direct testimony of Ms. Valdez and warned all parties in open court that trial was recessed until February 13, 2017, and that there would be no further continuances, delays or resets, and all parties who wished to have counsel should have them at that time.

8. The Court finds that [Wife] retained the law firm of Godwin, Bowman and Martinez for the sole purpose of requesting a continuance, and the firm filed a Motion for Continuance and Notice of Limited Appearance on January 28, 2017. A hearing was held and [Wife's] three counsel presented her fifth formal motion for continuance on February 13, 2017, which the Court denied after concluding that she failed to meet her burden that she was entitled to a continuance, and trial on the merits resumed.

The appellate record contains Nacol's motion to withdraw, but no reporter's record of the hearing, and Wife does not assign error to the trial court's order granting Nacol's motion or to its

–7–

finding that good cause existed for Nacol's "mandatory withdrawal" as Wife's counsel. The record reflects that the trial court granted Wife a 90-day period, between the first day of trial on November 15, 2016 and the resumption of trial on February 13, 2017, "in order to allow you to either organize your materials and properly present and represent yourself or for you to retain counsel," in addition to the three weeks that had already elapsed between the order on Nacol's withdrawal and the start of trial.

Citing *Harrison v. Harrison*, 367 S.W.3d 822 (Tex. App.—Houston [14th Dist.] 2012, pet. denied), Wife argues the trial court abused its discretion by denying her January 27, 2017 motion for continuance. She contends that as in *Harrison*, Husband was in control of the parties' assets so that she could not afford to retain an attorney. In *Harrison*, the trial court permitted the wife's (Connie's) attorney Joel A. Nass to withdraw 40 days before the case was set for jury trial, and denied Connie's request for a continuance. *Id.* at 824–25. On appeal, Connie challenged both the trial court's grant of Nass's motion to withdraw and its denial of her motion for continuance. *Id.* at 826. As "good cause" for withdrawal, Connie's attorney alleged that Connie "represents that she does not have the financial resources to satisfy the contractual obligation to pay the firm." *Id.* at 828.

The court of appeals concluded that "this record raises significant questions about whether Connie *substantially* failed to fulfill her obligation to pay Nass," explaining that it was unclear how much Nass had been paid at the time of the hearing on the motion to withdraw, how much Connie still owed to Nass, and "how much he required to continue participating in the case." *Id.* at 829–30. Further, the record did not reveal "why no request for interim fees was filed." *Id.* at 831. Although the court was "not prepared to say that allowing Nass to withdraw under these circumstances was an abuse of discretion, we note that allowing withdrawal in this instance approaches the outer limits of discretion." *Id.* at 831.

The court also explained that the trial court's decision to permit Nass's withdrawal under these circumstances "informs our review of the accompanying decision to deny a continuance" following the withdrawal. *Id.* The court concluded that the trial court abused its discretion in denying the continuance because there was no evidence that Connie was negligent or at fault in any way for her attorney's withdrawal. *Id.* at 835. Connie "strenuously opposed" Nass's withdrawal, filed a motion for continuance after trying without success to retain another attorney, and asked the court to award interim fees to pay Nass so that he could remain as her counsel and the case could proceed to trial as set. *Id.* at 832–33. In the 40-day period between her attorney's withdrawal and the commencement of trial, Connie attempted to retain another attorney without success, informing the trial court that "the attorneys she contacted were afraid to 'place themselves in a malpractice liability position' by taking her case." *Id.* at 832.

Here, the trial court found that "good cause exists" for Nacol's "mandatory withdrawal." Wife does not challenge this finding, and in contrast to *Harrison*, we have no record regarding Nacol's motion to withdraw to "inform our review" of the trial court's decision to deny Wife's motion for continuance. *Cf. id.* at 831. Instead, the record reflects that the trial court recessed the trial for 90 days to allow Wife to retain new counsel. Although Wife complained in her motion about the process for obtaining interim fees, so that she "has had no access to funds with which she can use to hire counsel," she did not argue or contend that Nacol's withdrawal was for nonpayment of fees, the sole reason for Nass's withdrawal in *Harrison*. *See id.* at 829–31.[4]

At the hearing on Wife's motion for continuance, Husband offered evidence that the parties agreed to a discovery schedule, which had expired; that Wife's experts had been retained by her prior attorneys and had been paid; that Wife had sought previous continuances to obtain discovery

---

[4] We also note that in *Harrison*, Connie was required to represent herself before a jury, while the trial in this case was before a private judge in a private setting. *See Harrison*, 367 S.W.3d at 825-26.

that was now completed; that Nacol had been paid for his representation of Wife through trial; that Husband was paying for Wife's residence, utilities, car, insurance, and their child's private school tuition; that Wife had sold both community property and Husband's separate property during the pendency of the divorce proceedings; and that Wife had income from her own business of approximately $10,000 per month.

In *Gillie v. Boulas*, 65 S.W.3d 219, 222 (Tex. App.—Dallas 2001, pet. denied), we concluded that the trial court did not abuse its discretion by denying Gillie's motion for continuance where the trial court allowed "almost four months"—here, approximately the time between Nacol's withdrawal in this case and ultimate commencement of trial—for Gillie to obtain new counsel. *Id.* And here, the trial court made detailed findings in support of its decision, citing the withdrawal of a previous attorney caused by Wife's "intentional actions," ten previous trial settings, completed document production and retention of experts by both parties, and numerous previous motions for continuance filed by Wife and granted by the trial court. In *Gillie*, we noted, "[o]ther courts have held shorter periods of time sufficient to obtain new counsel and prepare for trial. Gillie was *not* deprived of his right to be represented by counsel; he simply failed to secure representation within the time provided by the trial court." *Id.* at 223 (citation omitted). We conclude the trial court did not abuse its discretion by denying Wife's motion for continuance. *See Miller*, 239 S.W.3d at 442. We decide Wife's fourth issue against her.

**2. Property Division**

A trial court is charged with dividing the parties' estate in a just and right manner, considering the rights of both parties. TEX. FAM. CODE ANN. § 7.001; *In re S.A.A.*, 279 S.W.3d 853, 857 (Tex. App.—Dallas 2009, no pet.). The trial court may consider many factors, including the parties' earning capacities, education, business opportunities, physical condition, financial condition, age, size of separate estates, nature of the property, and the benefits that the spouse who

did not cause the breakup of the marriage would have enjoyed had the marriage continued. *In re S.A.A.*, 279 S.W.3d at 857 (citing *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981)). The court may also consider a spouse's dissipation of the community estate, a spouse's misuse of community property, and the parties' liabilities. *Id.* In considering whether the trial court abused its discretion in dividing the community estate, we determine whether some evidence of a substantive and probative character supports the trial court's decision, not whether we might have reached a different decision. *Id.*

### A. 4800 St. Johns

Through a separate property business she owned prior to the marriage, Wife was engaged in the renovations of two properties, located on St. John's and Beverly Drive in Dallas County. Wife's first issue challenges the trial court's finding that Husband "paid liabilities against this property in the amount of $829,219, $42,621, $375,000, $6279, and $401,952 for a total amount of $1,662,521," and the award of that amount to Husband in the judgment. Wife argues that these amounts were paid during the marriage while both Husband and Wife resided in the property,[5] and are consequently presumed to be community property, citing section 3.003(a) of the family code. *See* TEX. FAM. CODE ANN. § 3.003(a) (property possessed by either spouse during or on dissolution of marriage is presumed to be community property). Wife argues that Husband bore the burden to overcome the presumption by tracing and clearly identifying the property he claims as separate. *See Sink*, 364 S.W.3d at 344–45.

Wife argues that Husband's claims of $829,219, $375,000, and $401,952 were the amounts of loans made to Husband during the marriage, and consequently were community obligations. Husband replies that he and his expert both testified that the proceeds of the loans were given to

---

[5] Wife's arguments are directed to the property on St. John's, but the record reflects that the amounts she challenges in her first issue also relate to the property on Beverly Drive.

Wife to renovate her separate property. He argues that he offered evidence specifically tracing the funds as his separate property.

Husband relies on the testimony of his expert witness Autumn Kraus, who prepared reports admitted into evidence at trial characterizing and tracing the parties' separate and marital property. Kraus, who the trial court accepted as an expert witness in the fields of auditing, forensic accounting, and characterization and tracing of property, testified that Wife completed renovations on the St. Johns property and subsequently sold it. Husband "helped her with that by taking a loan out" through one of his separate property businesses in the amount of $825,000. The business paid $49,621 on the loan. Husband subsequently repaid the remainder loan after the sale of some of his separate property in Fort Worth. Kraus explained, "[s]o that claim for the 829,219 is a result of the payments that were made specifically for the payoff of the loan," and the $49,621 is the amount Husband's business paid on the loan before Husband paid it off. The record includes evidence that both the business and the Fort Worth property were Husband's separate property acquired before the marriage, and evidence of the loans and repayment. Similarly, Kraus explained that the same separate property business took out a second loan that was used for renovations of the St. Johns property, and payments and payoff of $6,729 and $375,000 were made in the same manner as the first loan.

Husband also offered evidence regarding the $401,952 obligation relating to the Beverly Drive property. Kraus testified,

> So this is a home located at 3515 Beverly Drive. There was a loan that was taken out of $400,000. . . . Again, this one was paid off by [Husband's] separate property, and the total amount with interest when it was paid off was $401,952. His separate property came from settlement of a lawsuit from his father's estate. So there was about $700,000 that came—over $700,000 that came into his account from a settlement of a lawsuit regarding his father's estate. We traced those funds through to determine how much money was his separate property that was used to pay off this loan.

Husband offered exhibits to support Kraus's testimony. Kraus also testified that in her opinion, the five amounts at issue were Wife's separate obligations, because all of the funds "came through and went through" a separate property business of Wife's.

Although Wife correctly argues that property possessed by either spouse during or on dissolution of the marriage is presumed to be community property, she also recognizes that a party may rebut the presumption by providing clear and convincing evidence of the property's separate character. *See Sink*, 364 S.W.3d at 344. Wife argues that Husband's testimony is insufficient to meet this burden. But Husband's testimony was supported by an expert's testimony and detailed documentation tracing $1,662,521 to Husband's separate property that was used to improve Wife's separate property. Based on this evidence, the trial court could have formed "a firm belief or conviction as to the truth of the allegations sought to be established." *See* TEX. FAM. CODE ANN. § 101.007 (defining "clear and convincing evidence"). We decide Wife's first issue against her.

### B. 4300 Bordeaux

In her second issue, Wife contends she established that she invested $400,000 of her separate property funds in a residence at 4300 Bordeaux. She does not dispute that the residence was Husband's separate property, but contends the trial court erred by failing to award her a judgment against Husband on her $400,000 reimbursement claim. She relies on (1) her testimony; (2) Petitioner's Exhibit 3, containing receipts showing expenditures of $380,440.34; (3) Kraus's testimony that money for improvements at the Bordeaux residence "didn't come from [Husband's] account"; and (4) a conflict between (a) Kraus's and Husband's testimony that $103,000 of expenditures at the residence "were presumed to be coming from community," and (b) Husband's Exhibit 9b, Tab 22.2 (Husband's inventory and appraisement with supporting documentation), showing $392,440.34 in "total out of pocket" remodel expenses.

The trial court's memorandum ruling provides:

> [Wife] testified that she invested $400,000 into Bordeaux which was [Husband's] separate property but there was no evidence of these funds produced nor was there testimony as to the value of the home prior to or after any expenditure of funds thus there is no enhancement in value claim to be reconstituted to her community or separate estate. There was testimony that established that the community spent . . . $103,542 on improvements to Bordeaux.

In its findings, the trial court awarded Wife $51,771.00 in connection with the community expenditures on the property.

The record supports the trial court's finding. Wife bore the burden of proving her reimbursement claim. *Hinton v. Burns*, 433 S.W.3d 189, 195 (Tex. App.—Dallas 2014, no pet.). Wife offered supporting documentation for expenses in the amount of $103,542, which was accepted and accounted for by Husband's expert. Husband's inventory and appraisement is not an admission that Wife actually spent $380,440.34; the exhibit Wife references shows Wife claims $380,440.34, but only supplied documentation to support $103,542.16. Although Wife testified she spent $400,000 of funds she obtained from the sale of her separate property, there was no other evidence to support her claim. We decide Wife's second issue against her.

### C. Ranch expenses

During the marriage, Wife and Husband operated a ranch in Paris, Texas that was Husband's separate property. Also during the marriage, Wife and Husband used community funds to build a house on the ranch. The trial court awarded Wife one-half of the expenditures on the house, and half of the funds expended on livestock and equipment at the ranch during the marriage. But the trial court did not make any award relating to the costs of operating the ranch during the marriage. In her third issue, Wife contends the trial court should have divided $6.5 million in community funds that were used to operate the ranch over the thirteen years of the parties' marriage, allocating $3.5 million to her.

–14–

Husband responds that the ranch is owned by a trust created for the benefit of R.R.G., the parties' son. Before Wife's attorney withdrew, the parties stipulated that the ranch was the separate property of Husband on the date of the marriage, and was the separate property of Husband on the date that it was transferred to the trust. Husband's expert witness Thomas Turner, the accountant who is responsible for preparing Husband's tax returns, testified that the ranch losses are assigned to Husband's personal tax return. Turner explained that the net operating losses associated with the ranch saved the community approximately $750,000 in the previous five tax years. He offered an exhibit, based on his preparation of tax returns for the community in the relevant years, and testified:

> Q. Mr. Turner, if I'm reading this [exhibit] correctly, did the community actually save just under 3 quarters of a million dollars in those five years because it had the ranch?
>
> A. That is correct.
>
> Q. So that would be, roughly, 125,000 a year in actual tax dollars that were not paid to the Internal Revenue Service?
>
> A. Correct.
>
> Q. And this is based off the tax returns that y'all—your office prepared for the community estate, is that correct?
>
> A. That is correct.

Turner also testified that the day-to-day operations of the trusts created for R.R.G.'s benefit are handled by two employees, and the trusts pay for their own operations. Turner testified that the operations of the trusts do not cost the community estate anything financially.

Wife relies on the following evidence to support her claim that the ranch required $500,000 annually in community funds to operate during the thirteen years of the marriage:

- Kraus's testimony that she "didn't analyze the ranch, the income and outgo, so, no, we didn't make any additional reimbursement, other than the ranch house";

–15–

- Wife's exhibit entitled "Paris, Texas Ranch, Furnishings, Construction, House, Barn, Corral, Eagles Nest, Improvements." This exhibit includes a map of and directions to the ranch, a magazine article about the ranch, pictures of furnishings at the ranch and receipts for the purchase of the furnishings for the ranch, drawings and other documents relating to the construction of the house at the ranch, and pictures of the ranch;

- Husband's inventory and appraisement, including documentary support for his reimbursement claim of $348,883.00 for the cost of construction of the ranch house; and

- Wife's post-trial "Proposed Settlement Statement" that includes the statement, "$500,000/year loss=$6,750,000 during the time of marriage," without supporting documentation or other evidence.

None of these references refute Husband's evidence that one of the trusts owned the ranch and that the trust was not operated with community funds. Further, the trial court found that "between 2007 and 2016 the community received trust income of more than $3,000,000.00 over any amounts it paid for trust expenses. These funds constituted the payment of principal and interest payments resulting [from] the sale of [Husband's] separate property to the [trusts]."

Although we agree with Wife's contention that property possessed by either spouse during or on dissolution of the marriage is community property, *see* TEX. FAM. CODE ANN. § 3.003(a), here, the parties stipulated that the ranch was the separate property of Husband, transferred to a trust. Assuming Wife had offered evidence of expenses paid by the community, the family code also required the trial court to make a just and right division of the entire community estate. TEX. FAM. CODE ANN. § 7.001. The trial court could have considered Husband's evidence that the operation of the ranch resulted in tax savings to the community, as well as evidence of the community's receipt of income from the trusts, in determining that a just and right division did not require reimbursement of the expenses for the ranch's operation. *See, e.g., In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d at 384 (trial court is afforded broad discretion in dividing community estate, and court of appeals must indulge every reasonable presumption in favor of trial court's proper exercise of its discretion). We decide Wife's third issue against her.

**D. Santa Fe property**

Wife owned a "summer home" in Santa Fe, New Mexico, that was sold during the marriage. The trial court found that Wife received $1.2 million from the sale of the property, and awarded that amount to Wife. But in her fourth issue, Wife contends this ruling was error. She argues that the $1.2 million was used during the marriage to pay for community expenses and liabilities, and she is entitled to a judgment against Husband for $600,000, one-half of the amount spent by the community.

Husband responds that he made a waste claim against Wife's separate estate for the $1.2 million proceeds from the sale of the Santa Fe property because Wife did not account for the proceeds. In support of this claim, Husband offered evidence that the proceeds of the sale were deposited into Wife's bank account. Kraus testified that Husband "did not ever get any of that money." Husband testified that he "paid the debt on Santa Fe" from his separate funds.

Husband contends Wife did not offer any evidence to support her contention that the $1.2 million was used to pay for "community expenses and liabilities." Wife testified that she did not know where the proceeds had gone. Wife cites her testimony that she made loans to Husband of $500,000 and an additional $200,000 to cover the payroll at one of his businesses a few weeks after the sale of the Santa Fe property. But Wife offered no documentation of this loan, and Husband denied it, explaining:

> A. There was an additional loan of $800,000 or a little more than $800,000 had been taken from H Bank. [Wife] paid back $600,000, which she alluded to earlier in her testimony. There was still over $200,000 not paid. So I took over the loan. The loan was in [Wife's] name secured by my asset. So there should be another $200,000 there [in his reimbursement claim]. . . .
>
> Q. [H]ow would you like the Court to address that $200,000?
>
> A. Well, I think I should get the credit for that. Certainly. [Wife] got the benefit for it. She wants to make this accusation that she advanced me $600,000, 400–, 200–, but that's not the reality. The reality, that was a $800,000 loan that was taken out

to her benefit. She only paid back a portion of it. I still owed. And then I took over the whole loan. . . .

The trial court found that Wife received $1.2 million from the sale of the Santa Fe property and did not account for the funds. Bank records offered into evidence showed deposit of the proceeds of the sale into Wife's bank account, and Wife offered no further evidence to support her claims that she loaned the proceeds to Husband or that the proceeds were used for community expenses and liabilities. The court reconstituted the community estate in that amount and awarded that amount to Wife. We conclude there was "some evidence of a substantive and probative character" to support the trial court's decision. *See In re S.A.A.*, 279 S.W.3d at 857. Accordingly, we decide Wife's fifth issue against her.

### E. Shopping center project

Husband purchased land for a shopping center project in Frisco, Texas during the marriage. Wife argues that Husband used $4 million of community funds for development of the project. In her sixth issue, Wife argues the trial court erred by failing to account for the $4 million in community funds, and contends she is entitled to a $2 million judgment against Husband even if, as Husband contends, the lender foreclosed on the project. Wife relies on her testimony that $4 million was "missing" relating to the project:

> Custer Bridges was a property . . . that was purchased during the marriage. There seems to be . . . $4 million missing around about—what this was worth. . . . I had community property claims on this, and it was in a Legacy Bank lawsuit during the beginning of our divorce, and I don't know if it got foreclosed on. . . . You know, we spent a million dollars on the stone alone that lines the floodways there . . . .

Wife also testified that there were documents showing the income on the project "and the missing $4 million" that she planned to offer into evidence, but the record does not reflect that she did so. Wife argues that Husband "did not dispute [Wife's] assertion or these numbers," and "merely testified that '[t]he property was foreclosed on.'"

Husband responds that the property was never owned by the community estate and was not a community estate asset at the time of trial. At trial, Husband testified that the property was purchased through an exchange between two separate property trusts and was subsequently lost in foreclosure. There was also evidence that the trusts, not Husband or the community, borrowed money to develop the property. And in addition to the testimony quoted by Wife, Husband also testified that the "million dollars in stone" was paid for by a development loan to the trusts.

Wife offered no evidence to the contrary. The trial court found that "[a]ll property in the various R.R.G. Trusts was the result of the transfer of [Husband's] separate property as stipulated, the mutation of the separate property of [Husband] as stipulated, or was an asset properly created within the R.R.G. Trusts with R.R.G. Trusts' properties." We conclude there was evidence the trial court could reasonably have found to be clear and convincing that the amounts expended on the shopping center project were not community property and that Wife was not entitled to a judgment for $2 million for expenditures on the project. *See Sink*, 364 S.W.3d at 344. We decide Wife's sixth issue against her.

### F. Jewelry

Wife testified that Husband took possession of three pieces of jewelry he had given her as gifts before and during their marriage. On December 1, 2012, Wife and Husband argued, and Wife called 911. The police report from the incident introduced into evidence at trial reflects that the police required one of the spouses to leave the home for the night, and Husband did so. Wife testified that when Husband returned home the next morning, he took the jewelry, promising that Wife could have it back "if you're a good girl." Wife testified that she does not have possession of the jewelry because Husband took it on December 2, 2012: "The last time I saw my jewelry was when I took it off, when we first got home" on December 1. The value of the jewelry was $520,800, according to an appraisal admitted into evidence at trial. In her seventh issue, Wife

argues she is "entitled to a judgment against [Husband] in the amount of $520,800, representing the value of her jewelry."

Husband introduced evidence that in February, 2013, Wife had the jewelry appraised. The appraisal included pictures of the jewelry. Husband also argues that the police report from December 1, 2012, states that Husband "gathered a few personal items (watch, toothbrush, deodorant and wallet) and was driven to a friend[']s residence," and does not reflect that Husband also took any jewelry with him. In finding of fact 36, the trial court found that Wife had the jewelry appraised in February, 2013 "and forwarded the appraisals and insured the jewelry on February 22, 2013, after she alleged they were missing. [Wife] made a claim to the insurance company that the jewelry was lost in 2015." The trial court also found that Wife "never filed a report with the police concerning the allegedly missing jewelry." The trial court concluded,

> 13. On the claim of conversion—this claim is denied as the Court found (a) a Highland Park police officer inventoried all items removed from the residence by [Husband]; ([b]) [Wife] had the jewelry appraised on February 8, 2013 and insured on February 22, 2013, both dates after the date she alleged [Husband] took possession of the jewelry; (c) [Wife] listed the ring and jewelry as an asset on a federal loan application on March 19, 2015, well after the date she accused [Husband] of stealing them.

We conclude the evidence was legally and factually sufficient to support the trial court's ruling regarding the jewelry in question. We decide Wife's seventh issue against her.

CONCLUSION

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

170722F.P05

–20–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF R.R.G., A CHILD,

No. 05-17-00722-CV

On Appeal from the 254th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-01163.
Opinion delivered by Justice Lang-Miers; Justices Bridges and Francis, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Stanley V. Graff recover his costs of this appeal from appellant Deborah C. Graff.

Judgment entered this 21st day of November, 2018.