

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00236-CV

———————————————————

IN THE INTEREST OF P.J., A CHILD

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 22-1734-16

---

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

In this suit affecting the parent–child relationship (SAPCR), Father claims that Mother effectively duped him into signing the mediated settlement agreement (MSA) that—until this case—governed custody of and financial support for their son, P.J. (Peter). Father filed the present suit to modify the MSA-based judgment, claiming that the circumstances had materially and substantially changed because he had discovered Mother's deception. In the bench trial that followed, Father presented detailed testimony regarding Mother's pre-MSA misdeeds, and he pointed to several post-MSA events that, in Father's view, indicated that Mother was continuing her pre-MSA pattern of misbehavior. Based on this evidence, the trial court modified the terms of Peter's custody and financial support while also ordering Mother to pay for past-due child support and medical expenses.

Mother challenges every aspect of this modification judgment. She argues that there was insufficient evidence of a material and substantial change in the parties' circumstances to support the custody modification, insufficient evidence of a material and substantial change in the parties' finances to support the financial-support modification, and insufficient evidence of the amount she owed in child support or medical expenses. We agree on all counts; we will reverse and remand.

## I. Background

Mother and Father have one child together—Peter—and they have been litigating the terms of his custody and financial support for most of his life.

2

## A. Prior Litigation, Estranged Husband, and MSA

The litigation began in 2019, when Peter was four. A final SAPCR judgment resolved the case in 2021, but later that year, Father filed a petition to modify it. At the time, Mother had separated from her then-husband (Estranged Husband)[1] and moved out of his home, though the two were still seeing one another.[2] Regardless, as relevant here, Mother's social relationship with Estranged Husband had ended when, on July 20, 2022, Mother and Father executed an MSA. The MSA

- made Mother and Father joint managing conservators of then-seven-year-old Peter;

- gave Father the exclusive right to designate Peter's primary residence;

- prohibited Mother from consuming alcohol during or within twelve hours of her possession of Peter;

- required Mother to submit to drug testing at Father's request up to once per quarter;

- prohibited Estranged Husband from being allowed in Peter's presence;

- provided Mother with a standard possession schedule that would convert to an expanded schedule "[o]nce Mother moves within 25 miles of [Peter's] current residence";

- required Father to provide Peter's medical and dental insurance;

---

[1]As of trial, Mother was still in the process of getting a divorce from Estranged Husband.

[2]Estranged Husband testified that Mother moved out in approximately September 2021 but that the two continued socializing and staying at one another's homes for approximately eight months afterward.

3

- required the parents to split the cost of unreimbursed medical and dental expenses, with payment due within a certain amount of time after receiving notice of the expense; and

- provided that neither parent would pay the other for child support or medical support.

The trial court entered an agreed order effectuating the MSA's terms in November 2022, and neither party appealed the order, moved for a new trial, or filed a bill of review.

## B. Petition to Modify and Temporary Orders

But before the year's end, in December 2022,[3] Father again petitioned to modify the terms of Peter's custody and financial support—the petition underlying this appeal. Father claimed that the circumstances had materially and substantially changed since the MSA because he had learned that Mother had lied to him about various pre-MSA events.[4] He asked to be appointed as Peter's sole managing conservator, he sought child support from Mother, and he requested related temporary orders.

The trial court held a hearing on the request for temporary orders, and it announced its decision at the end. In doing so, the trial court instructed Mother "not

---

[3]The agreed, MSA-based judgment was entered on November 1, 2022, and Father filed his modification suit fifty days later, on December 21, 2022.

[4]In an affidavit attached to Father's petition, he clarified when he had learned of Mother's alleged lies: in November 2022—within thirty days of the trial court entering the agreed, MSA-based judgment. *Cf.* Tex. R. App. P. 26.1 (setting deadline for notice of appeal as thirty days after judgment's signing or ninety days after signing if motion for new trial or another qualifying post-judgment motion is filed); Tex. R. Civ. P. 329b(a) (setting deadline for motion for new trial as thirty days after judgment's signing).

4

[to] have any paramours present during any visitation of the child for any reason whatsoever." Although this oral directive did not make its way into the written temporary orders that followed,[5] the other relevant aspects of the trial court's oral ruling did:

- The court appointed Father as temporary sole managing conservator;

- It required supervision of Mother's possession periods;

- It conditioned Mother's possession on her compliance with regular SoberLink testing;

- It required Mother to submit to random drug testing upon Father's request;

- It continued the MSA's requirement that Father provide Peter's medical and dental insurance;

- It continued the MSA's requirement that each parent pay half of unreimbursed medical and dental expenses within a certain amount of time after receiving proper notice; and

- It required Mother to pay $288.22 in monthly temporary child support beginning on April 1, 2023.[6]

## C.    Bench Trial

The case proceeded to a bench trial in November 2023—more than sixteen months after the July 2022 MSA.

---

[5]The trial court later added to its written temporary orders by issuing a series of temporary restraining orders. One of the temporary restraining orders—an order issued after a hearing in which Mother admitted that she had introduced Peter to her boyfriend during a boat outing that summer—prohibited Mother from allowing paramours to be in Peter's presence at any time.

[6]The trial court did not sign written temporary orders until several months after the hearing.

### 1. Evidence Regarding Child Custody

Father testified that, after he had signed the MSA, he had discovered—often through Estranged Husband—that Mother had lied to him about several pre-MSA events:

- Father "found out after the [MSA] that [Mother] had been leaving [Peter] home alone" even though she had "told [Father] she never left [Peter] at home alone." Estranged Husband also testified and confirmed as much.

- Father described an incident in which Peter had possession of a loaded handgun while at Mother's home. Father stated that, before the MSA, Mother had told him "that [the incident] didn't happen," but Father later found out that it had in fact happened and that Mother had been "leaving loaded firearms in [Peter's] room."[7]

- After the MSA, Father "found out about the extent of [physical] abuse that had been happening in front of [Peter]" while Mother was living with Estranged Husband.

- Father testified that, before the MSA, he had not been aware of the extent of Mother's drug use during her relationship with Estranged Husband. Estranged Husband stated that such drug use had included "[m]olly, ecstasy, marijuana, [and] cocaine[,] . . . all of them multiple times."

- Father implied that he had not been aware of Mother's alleged ability to evade drug tests. Estranged Husband testified that he had seen Mother trick the SoberLink test and that he had observed Mother dye her hair or get her nails done before taking a hair or nail drug test.

Father claimed that Mother's deceit was consistent with her longstanding "pattern of behavior," and he dedicated much of his evidence to this topic, highlighting Mother's abusive relationships—with Estranged Husband and others before him—and

---

[7]Estranged Husband confirmed that he had not informed Father of the facts behind the gun incident until November 2022.

her use of drugs and alcohol in years past. But given the comparatively short amount of time that had passed since the MSA, the evidence of Mother's post-MSA behavior was much more limited:

- Father testified that, since the MSA, Mother had repeatedly declined to exercise her midweek possession of Peter. He acknowledged, though, that Mother had lived on a different side of the Dallas–Fort Worth area for much of the relevant time and that driving between her home in Fort Worth and Father's home in Frisco could be difficult on a weekday evening.

- Father testified that Mother was not reliably on time to pick up or drop off Peter, and that, on several occasions, he had noticed that Peter would be wearing the same clothes when he returned from Mother's possession.

- Both Mother and Father testified that, since the MSA, Peter had sustained a skateboarding injury—"a busted chin and a broken tooth"—while in Mother's custody. Father claimed that Mother's visitation supervisor had not been with her when the injury occurred, and he noted that he—not Mother—had taken Peter to the dentist to address the chipped tooth.

- Estranged Husband's father (Estranged Grandfather) testified that, both before and after the MSA, he had heard Mother refer to Peter with profanity-laden insults, though there had "not [been] as much [of such talk] in the last year as [he] ha[d heard] before."

- Mother acknowledged that she had introduced Peter to her boyfriend (Boyfriend) in violation of the trial court's oral prohibition.[8] Mother, her supervisor, and Boyfriend all testified that the introduction had occurred on a single occasion in a group boat outing and that she had presented Boyfriend to Peter as a friend.

---

[8]Mother claimed that she had not "know[n] what a paramour meant" when the trial court issued its oral directive.

- Father claimed that, since the MSA, Mother had tested positive for "different levels of amphetamines and THC" on "multiple" occasions,[9] identifying two positive tests in particular, and offering one of them into evidence. The report reflected that Mother's nail sample had tested positive for "delta 9-thc"[10] and "amphetamine" in late 2022. Mother conceded that she had tested positive for the same substances in early 2023. She explained the THC result by stating that, as a hairdresser, she worked with hair products and chemicals that contained CBD.[11] As for the amphetamine, Mother stated—and Father acknowledged—that she had a prescription for Vyvanse, which was an amphetamine.

- Father questioned why Mother's prescription amphetamine had not consistently appeared on her drug tests. He attributed this inconsistency to Mother's ability to trick the tests, alluding to Mother's work as a hairdresser to imply that she knew how to invalidate hair-based tests. Mother stated that the inconsistency was attributable to the lab's ability to get in touch with her to verify her prescription.

Father argued that these events showed that Mother's history of making poor choices had not changed and that she was not fit to be Peter's joint managing conservator.

### 2. Evidence Regarding Financial Support

Although child custody was the primary focus at trial, the parties also briefly discussed Peter's financial support.

---

[9]Similarly, Estranged Grandfather testified that Mother had failed "several" drug tests since November 2022, and Estranged Husband testified that she had twice tested positive for marijuana. No additional detail or documentation was provided.

[10]"Delta-9 tetrahydrocannabinol (THC)" is "[t]he primary psychoactive component of cannabis." 25 Tex. Admin. Code § 300.101(10) (Tex. Dep't of State Health Servs., Definitions). Often, and as relevant here, "delta-9 tetrahydrocannabinol and THC are [used] interchangeabl[y]." *Id.*

[11]"Cannabidiol (CBD)," is "[a] phytocannabinoid identified as an extract from cannabis plants." *Id.* § 300.101(6).

Father sought child-support payments from Mother to accompany his new role as Peter's sole managing conservator. Mother testified that she made $60,000 as a hairdresser in years past but that she was making "between 40 and 60" at the time of trial, as she "had to rebuild [her] clientele" after relocating to be closer to Peter. Father questioned these figures. He offered evidence of Mother's expensive purchases[12] and testified that, although "70,000 . . . [was] what she [had] reported . . . to the judge," Estranged Husband "had reported that she was making much more than that." Estranged Husband confirmed that, when he and Mother lived together, "she would have cleared over 200[,000]" in income. Father did not discuss his own salary or Peter's expenses.

Mother, meanwhile, testified that she 'believ[ed]" Father had previously testified to making "160 or 170" per year, and she introduced an exhibit that represented Father's income as $180,000 based on "prior testimony." The referenced "prior testimony" was not admitted at trial, nor was any other evidence introduced regarding the parties' incomes.

Regarding Mother's financial-support payments up until that time, Father testified that Mother had not paid all of the child support required of her under the temporary orders, and Mother conceded as much. Father did not specify how much

---

[12]Specifically, Father offered evidence that, Mother had obtained a new tattoo, undergone plastic surgery, and purchased a new car. Mother claimed that she had not paid cash for the items, having bartered for the tattoos, not paid for her surgery, and traded in her old vehicle for the new one.

Mother had failed to pay, though, and when Mother was asked to confirm a specific amount, Mother stated that she "d[id]n't know the exact number."[13] No other evidence was introduced regarding Mother's past-due payments.

## D.  Modification Judgment

After hearing the evidence, the trial court granted Father's request for a modification based on changed circumstances. It entered a modification judgment that, among other things,

- appointed Father as sole managing conservator;

- required Mother to pay ongoing monthly child support of $1,582.45, medical support of $176.23, and dental support of $18.02; and

- ordered Mother to pay arrearages of $1,140 for past-due child support and of $420.52 for past-due contributions to unreimbursed medical expenses.

## II. Discussion

Mother argues that (1) the custody modification was based on legally and factually insufficient evidence of a material and substantial change in the parties' circumstances since the MSA; (2) the financial-support modification was similarly based on legally and factually insufficient evidence of a material and substantial change; and

---

[13]Father's counsel had proposed a dollar figure, asking if it was "true that during the temporary orders in this case, [Mother had] paid a total of around $600 in child support."

10

(3) there was legally and factually insufficient evidence of the amount she owed in temporary child support or unreimbursed medical expenses.[14]

## A.    Sufficiency Standard of Review

We review a trial court's modification of a custody or financial-support order for an abuse of discretion. *Vanderbol v. Vanderbol*, No. 02-23-00230-CV, 2024 WL 1925141, at *2, *9 (Tex. App.—Fort Worth May 2, 2024, pet. denied) (mem. op.); *In re R.R.K.*, No. 02-20-00302-CV, 2022 WL 1257136, at *3 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.) (mem. op.). A trial court abuses its discretion if it acts arbitrarily, which it does when it relies on legally or factually insufficient evidence.[15] *Vanderbol*, 2024 WL 1925141, at *2.

In assessing the legal sufficiency of the evidence to support a trial-court finding, we view the record in a light most favorable to the judgment to determine whether there is more than a scintilla of evidence to support it. *See In re L.B.*, No. 02-19-00345-CV, 2020 WL 1808486, at *6 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.); *In re K.R.*, No. 02-15-00276-CV, 2016 WL 3198611, at *3 (Tex. App.—Fort Worth June 9, 2016, no pet.) (mem. op.). For factual sufficiency, we consider and weigh all of

---

[14]Mother frames her appeal as presenting two issues, but we construe them as three.

[15]When, as here, no findings of fact or conclusions of law were filed, the trial court's ruling implies all factfindings necessary to support it, and we must affirm those findings if there is sufficient evidence backing them. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Vanderbol*, 2024 WL 1925141, at *2; *In re J.E.*, No. 02-20-00105-CV, 2021 WL 2753550, at *3 (Tex. App.—Fort Worth July 1, 2021, pet. denied) (mem. op.).

the pertinent evidence to determine whether the credible evidence supporting the challenged finding is so weak or the finding is so contrary to the overwhelming weight of the evidence that it must be set aside. *In re B.M.*, No. 02-24-00035-CV, 2025 WL 211330, at *3 (Tex. App.—Fort Worth Jan. 16, 2025, no pet.) (mem. op.); *R.R.K.*, 2022 WL 1257136, at *4; *K.R.*, 2016 WL 3198611, at *3.

Throughout our review, we yield to the trial court's assessment of the witnesses' credibility and demeanor. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021); *L.B.*, 2020 WL 1808486, at *6; *In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *6 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (mem. op.). If the probative evidence conflicts, it is the trial court's prerogative to resolve the conflict and believe one witness over another. *See B.M.*, 2025 WL 211330, at *7; *In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *6 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.).

## B. Custody Modification

Mother first argues that the trial court abused its discretion by modifying the custody arrangement because there was legally and factually insufficient evidence of a material and substantial change in the parties' circumstances since the MSA.[16]

---

[16]Mother also asserts that (1) the admission of evidence regarding her pre-MSA conduct was an abuse of discretion and (2) the "punitive stair-step possession schedule" was an abuse of discretion. Because we resolve Mother's challenge to the custody modification based on the material-and-substantial-change requirement, we need not address her remaining arguments. *See* Tex. R. App. P. 47.1.

12

## 1. Governing Law: Material-and-Substantial-Change Requirement

"In an effort to ensure stability and continuity for children, Texas law has imposed 'significant hurdles' before a conservatorship order may be modified." *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2009, no pet.). As relevant here, to modify a custody order, a trial court must find that modification is in the child's best interest and that "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since . . . the date of the signing of [the] mediated . . . settlement agreement on which the order [wa]s based." Tex. Fam. Code Ann. § 156.101(a)(1)(B).

The existence of a material and substantial change is a threshold requirement. *See R.R.K.*, 2022 WL 1257136, at *4; *E.M.*, 2019 WL 2635565, at *6; *A.L.E.*, 279 S.W.3d at 428; *see also In re J.R.*, No. 02-23-00071-CV, 2024 WL 191211, at *3 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (clarifying that "[t]he person seeking modification has the burden"). Assessing whether such a change has occurred is a fact-specific determination and requires a comparison of the conditions that existed at the time of the MSA's signing with the conditions at the time of the modification trial. *See R.R.K.*, 2022 WL 1257136, at *5; *E.M.*, 2019 WL 2635565, at *6–7; *In re A.B.R.*, No. 04-17-00220-CV, 2018 WL 3998684, at *4 (Tex. App.—San Antonio Aug. 22, 2018, no pet.) (mem. op.). "[I]t is not the fact of change that drives a modification but whether these changes are material and substantial changes in the parenting arrangement." *E.M.*, 2019 WL 2635565, at *6.

Changes that Texas courts have recognized as material and substantial include (1) a parent's remarriage; (2) a parent's relocation; (3) a parent's abuse of drugs or alcohol; (4) a change in the child's age that results in changed needs; (5) a parent's abuse or extreme neglect of a child; and (6) a parent's attempts to alienate the child from the other parent. *A.B.R.*, 2018 WL 3998684, at *4; *Smith v. Karanja*, 546 S.W.3d 734, 741 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *In re S.N.Z.*, 421 S.W.3d 899, 911 (Tex. App.—Dallas 2014, pet. denied); *In re J.A.R.*, No. 2-04-123-CV, 2005 WL 2839107, at *7 (Tex. App.—Fort Worth Oct. 27, 2005, no pet.) (per curiam) (mem. op.). Changes that have not been considered material or substantial, in contrast, have included (1) a parent's relocation that was anticipated at the time of the MSA; (2) a parent's decreased participation in raising the child; (3) an increase in the child's extracurricular activities; and (4) a change in the child's age, standing alone. *A.B.R.*, 2018 WL 3998684, at *4–6; *In re C.R.G.*, No. 05-10-01472-CV, 2012 WL 3133785, at *4 (Tex. App.—Dallas Aug. 2, 2012, no pet.) (mem. op.). As these examples demonstrate, "[a] showing of only slight change of conditions is not sufficient grounds to change custody of children.'" *Short v. Short*, 354 S.W.2d 933, 936 (Tex. 1962) (holding father's relocation insufficient to support modification). "As a matter of public policy, there should be a high degree of stability in the home and surroundings of a young child, and, in the absence of materially changed conditions, the disturbing influence of re-litigation should be discouraged." *Knowles v. Grimes*, 437 S.W.2d 816, 817 (Tex. 1969); *see A.B.R.*, 2018 WL 3998684, at *3–

8 (quoting *Knowles* and reversing modification due to insufficient evidence of material and substantial change).

### 2. Analysis: Insufficient Evidence of Material and Substantial Change

Father argues that there was ample evidence of a material and substantial change because (1) he "presented a clear and detailed timeline [of] discovering Mother's [pre-MSA] lies to him . . . post-MSA"; and because (2) in addition to Mother's pre-MSA "lies," her post-MSA actions reflected that her pattern of behavior was continuing. [Capitalization altered.]

### a. Post-MSA Discovery of Pre-MSA Deception

Father's primary argument both at trial and on appeal is that, when he entered into the MSA, he was relying on Mother's false statements regarding her parental fitness and Peter's circumstances. Father's discovery of Mother's "lies" was, he claims, a material and substantial change that warranted modification.

But this argument—that Mother duped him into signing the MSA—amounts to an attack on the MSA's validity. A modification proceeding based on changed circumstances is not the proper vehicle for such an attack.[17] *Cf. In re C.W.J.*, No. 11-17-00085-CV, 2019 WL 1067489, at *5 (Tex. App.—Eastland Mar. 7, 2019, no pet.) (mem. op.) (noting that father's contention that the original custody order's possession

---

[17]As previously noted, Father's pleadings reflect that he discovered Mother's deceit within thirty days of the agreed, MSA-based judgment, but he did not file a motion for new trial, an appeal, or a bill of review to directly attack its validity. *See supra* notes 3–4.

15

schedule was "contrary to legislative intent" was "essentially . . . a collateral attack on the original decree" and going on to affirm trial court's finding that circumstances had not materially or substantially changed).

Because Father filed a modification proceeding based on changed circumstances, and because he obtained relief on that basis, he was required to offer evidence that circumstances had actually changed—in reality, not just his awareness or understanding of reality. *See* Tex. Fam. Code Ann. § 156.101(a)(1) (requiring, in plain language, evidence that "the circumstances . . . have materially and substantially changed"); *A.B.R.*, 2018 WL 3998684, at *4 (reiterating that "a party seeking to modify a prior final order under [S]ection 156.101(a)(1) must show there is an actual change in circumstances"). Father's post-MSA discovery of Mother's pre-MSA "lies," i.e., his discovery that the circumstances had not been what he thought they were, was not equivalent to an actual change in circumstances.[18] *Cf. Branham v. Davenport*, No. 01-11-00992-CV, 2013 WL 5604736, at *5–6 (Tex. App.—Houston [1st Dist.] Oct. 10, 2013, no pet.) (mem. op.) (affirming finding of no material or substantial change and noting that, although father claimed that he had not realized the impact of long drives on his PTSD, he had been aware of both PTSD and need for drives at the time of the MSA).

---

[18]Father cites *J.A.R.* as support for his reliance on pre-MSA events, but in that case, we expressly noted that "it [wa]s plain . . . that the conduct that [wa]s relied upon as showing a material change in circumstances occurred subsequent to the decree sought to be modified." 2005 WL 2839107, at *8.

### b. Post-MSA Events

Despite Father's focus on Mother's pre-MSA conduct, he presented some evidence of post-MSA events as well. And on appeal, Father highlights four post-MSA developments in particular and argues that such developments were sufficient to support the material-and-substantial-change finding.[19]

### i. Failure to Exercise Midweek Possession

First, Father claims that Mother's post-MSA failure to exercise her midweek possession constituted a material and substantial change. But there was no evidence that Mother regularly exercised all of her possession periods before the MSA, so the trial court could not have determined that there had been a change in that regard. *See Agraz v. Carnley*, 143 S.W.3d 547, 554 (Tex. App.—Dallas 2004, no pet.) (holding mother's assertion that father "doesn't come home until after [the children are] in bed at night[ and] is not participating in any way in their raising" was insufficient to

---

[19]The record reveals another post-MSA development that Father does not mention: Mother's relocation. *Cf. A.B.R.*, 2018 WL 3998684, at *5 (considering parties' relocation as potential material and substantial change and noting that, although parties did not raise the issue, "we must affirm the trial court's finding if there is any evidence of a substantive and probative character to support the finding"). But because Mother's relocation was contemplated by the MSA, it does not qualify as a material and substantial change for purposes of modification. *See Dunn v. Garcia*, No. 01-21-00100-CV, 2022 WL 2347739, at *9 (Tex. App.—Houston [1st Dist.] June 30, 2022, no pet.) (mem. op.) (holding that, because father's move "was authorized in the Agreed Order and anticipated at the time of its rendition, his relocation . . . does not constitute evidence of materially and substantially changed circumstances"); *A.B.R.*, 2018 WL 3998684, at *5 (holding that parent's relocation to Puerto Rico was not a material or substantial change because it was contemplated before the MSA).

constitute material and substantial change when prior conditions were not shown). Nor do we see how Mother's failure to take advantage of all of her possession periods in a specific sixteen-month period was so material and significant as to justify the destabilizing effect of re-litigating Peter's custody.[20] *See Dunn*, 2022 WL 2347739, at *9–10 (holding father's work schedule could not support material-and-substantial-change finding when evidence showed that, although he traveled extensively and hired others to supervise the children, he had done so at the time of the prior order as well); *E.M.*, 2019 WL 2635565, at *6–7 (affirming finding of no material and substantial change despite evidence that mother's work hours had increased since divorce while father traveled less and had more flexibility); *A.B.R.*, 2018 WL 3998684, at *7 (holding children's increase in extracurricular activities did not constitute material and substantial change even though it "had a significant effect on [the father's] ability to enjoy quality time" with the children).

### ii.    Peter's Skateboarding Injury

Father next points to the evidence of "physical injuries to the child while under supervised possession with Mother," i.e., Peter's skateboarding injury. But he does not explain why such injury constituted a material or substantial change in the parenting arrangement, in Peter's environment, or in Mother's parental fitness. *See E.M.*, 2019

---

[20]Moreover, Father conceded that Mother lived on a different side of the Dallas–Fort Worth area for at least a portion of the sixteen months and that traffic between Fort Worth and Frisco could be difficult on weeknight evenings.

WL 2635565, at *6 (emphasizing that mere change is insufficient unless it is a "material and substantial change[] in the parenting arrangement"); *A.B.R.*, 2018 WL 3998684, at *7–8 (noting that change "must be material to some aspect of the parent–child relationship that justifies changing an order affecting the parent–child relationship").

At trial, Father did not dispute the cause of Peter's injuries,[21] and although he complained that Mother's visitation supervisor had not been present at the time of the injury and that Father had been required to take Peter for dental work, there was no evidence that Peter's injury reflected neglect or mistreatment of any kind. In fact, Father testified that he, too, had skateboarded as a child; that he had sustained a similar dental injury following a biking accident; and that, to address Peter's chipped tooth, he had taken Peter to the same dentist who had fixed his own teeth. There was thus no evidence that the skateboarding injury amounted to a substantial change that was material to the terms of Peter's custody.

### iii. Peter's Introduction to Boyfriend

The same is true of the third development that Father cites: Mother's introduction of Peter to Boyfriend. While Father emphasizes that the introduction was in violation of the trial court's oral prohibition on Mother "hav[ing] any paramours present during any visitation," and while we certainly do not condone such disregard of

---

[21]Although Father stated that Peter had been "injured from what was called a skateboard accident," implying that he questioned the injury's cause, he did not identify or offer evidence of any alternative cause.

trial-court directives, the fact that an action violates a trial-court directive does not make it a material and substantial change for purposes of modification.[22] And here, the action at issue—Peter's introduction to Boyfriend—occurred on a single occasion in a group setting with Mother's supervisor present. While Mother's decision to make this introduction was certainly relevant to determining Peter's best interest, there was no evidence that the event constituted a substantial change that was so material to the parenting arrangement that it warranted re-litigating Peter's custody. *Cf. E.M.*, 2019 WL 2635565, at *7 (affirming finding of no material and substantial change and noting that mother's remarriage did not necessarily constitute such a change absent additional evidence or explanation); *see also A.B.R.*, 2018 WL 3998684, at *8 (holding children's "communication difficulties with their therapist" insufficient to support finding of material and substantial change).

### iv. Mother's Positive Drug Tests

The final development that Father cites is the strongest evidence of a material and substantial change: Mother's two positive drug tests. But while Father frames such evidence as Mother's having "failed" the tests, the record is not so clear.

It was undisputed that Mother had a prescription for an amphetamine. Although Father speculated that the inconsistent appearance of this amphetamine in Mother's

---

[22]Indeed, treating the two—a violation and a material and substantial change—as one would allow a parent to obtain temporary orders based on the allegedly preexisting need for a modification then satisfy the threshold requirement for such modification by relying on a violation of the temporary orders.

drug-test results was an indication of her ability to trick the tests, there was no evidence that, since the MSA, Mother had been observed doing so.[23] Nor was there any expert testimony interpreting or clarifying the drug-test results. So Father's speculation about what could be read into Mother's amphetamine test results remained just that: speculation. *Cf. Dunn*, 2022 WL 2347739, at *11 (holding that "Mother's *allegation* that Father violated [a criminal law requiring him to report suspected child abuse wa]s not evidence of a material and substantial change in circumstances").

The THC test results, too, were ambiguous. While there was evidence that Mother had tested positive for "delta 9-thc" on two occasions since the MSA, not all forms and concentrations of THC are illegal in Texas, and Mother testified that she handled CBD products as part of her work as a hairdresser. *Cf.* Tex. Agric. Code Ann. § 121.001 (defining "hemp" as containing "a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis"); Tex. Health & Safety Code Ann. § 481.002(5) (defining "[c]ontrolled substance" to exclude hemp), (26) (defining "[m]arihuana" to exclude hemp), § 481.121(a) (prohibiting possession of "usable quantity of marihuana"); 25 Tex. Admin. Code § 300.101 (Tex. Dep't of State Health Servs., Definitions) (defining "CBD," "[a]cceptable hemp THC level," "[c]onsumable hemp product," and "[h]emp"), § 300.302 (Tex. Dep't of State Health

---

[23]Again, Estranged Husband testified that he had not socialized or lived with Mother since 2021, so his claim to have observed Mother tricking SoberLink tests necessarily related to pre-MSA behavior.

Servs., Sample Analysis of Consumable Hemp and Certain Cannabinoid Oils) (providing for sampling of consumable hemp products, including CBD oil, to ensure "a delta-9 tetrahydrocannabinol content concentration level . . . of 0.3 percent or less"), § 300.401 (Tex. Dep't of State Health Servs., Possession, Distribution, and Sale of Consumable Hemp Products) (authorizing licensed or registered persons to sell consumable hemp products). The trial court was not required to believe Mother's statements, but even assuming it did not, there was no expert testimony clarifying the meaning of Mother's test results or whether the amount of THC in Mother's nail samples indicated that she had consumed or handled an illegal substance. Nor was there evidence that Mother had been observed possessing marijuana, smoking marijuana, or exhibiting symptoms of marijuana use at any point since the MSA.[24] Nor was there any evidence that Mother's alleged THC use had impacted her behavior, parenting skills, or interaction with Peter in any way.

Nonetheless, Mother's ambiguous drug-test results were concerning. Such results amounted to more than a scintilla of evidence that she had used, consumed, or handled an illegal substance since the MSA was executed, and because the MSA's drug-testing requirement reflected that such substances were an area of particular concern for the parties, this evidence was arguably legally sufficient to support the trial court's material-and-substantial-change finding. However, without more, the ambiguous test

---

[24]In fact, the sole positive drug-test report in evidence included the caveat, "Toenail clippings and shavings tested ([u]p to 12 months timeframe)."

22

results were not factually sufficient to support the trial court's finding. Viewing the record as a whole, this evidence was far too weak to allow a reasonable factfinder to conclude not only that Mother had used illegal substances but also that her use had risen to the level of a material and substantial change to her parental fitness or Peter's circumstances so as to justify "the disturbing influence of re-litigation." *Knowles*, 437 S.W.2d at 817; *cf. In re L.Z.U.*, No. 04-21-00493-CV, 2022 WL 5047969, at \*4 (Tex. App.—San Antonio Oct. 5, 2022, no pet.) (mem. op.) (holding sufficient evidence of material and substantial change when mother admitted using multiple drugs, she exhibited "distracted" and "forgetful" behavior, and the "trial court was presented with evidence that since th[e prior custody] order, [m]other's drug concerns ha[d] negatively affected [the child]"); *A.L.E.*, 279 S.W.3d at 429–30 (holding that evidence of mother's substance abuse, her escalating "drinking fit[s]," and the negative effects on daughter supported finding of material and substantial change in mother's fitness to exercise primary custody).

### c.   Conclusion

Although Mother's post-MSA drug-test results were legally sufficient to support the trial court's implied finding of a material and substantial change, because the evidence was factually insufficient to support the finding, the trial court abused its discretion by making it. *See R.R.K.*, 2022 WL 1257136, at \*13–15 (holding evidence factually insufficient to support material-and-substantial-change finding underlying certain SAPCR modifications). We sustain Mother's first issue.

**C.      Financial-Support Modification**

Mother also challenges the legal and factual sufficiency of the evidence to support the trial court's modification of her financial-support obligations, i.e., her child-support, medical-support, and dental-support requirements.

**1.      Governing Law: Material-and-Substantial-Change Requirement**

Much like a custody modification, a financial-support modification requires evidence that "the circumstances of the child or a person affected by the order have materially and substantially changed since . . . the date of the signing of a mediated . . . settlement agreement on which the order is based." Tex. Fam. Code Ann. § 156.401(a)(1)(B). But in the financial-support context, the required change generally refers to the parties' financial circumstances. *See In re E.C.*, No. 05-22-01330-CV, 2024 WL 2126710, at *4 (Tex. App.—Dallas May 13, 2024, no pet.) (mem. op.); *In re K.G.*, No. 02-23-00180-CV, 2024 WL 273505, at *2 (Tex. App.—Fort Worth Jan. 25, 2024, no pet.) (mem. op.). "Unless the record contains both historical and current evidence of the relevant person's financial circumstances, the court has nothing to compare and cannot determine whether a material and substantial change has occurred." *K.G.*, 2024 WL 273505, at *2.

**2.      Analysis: Insufficient Evidence of Material and Substantial Change**

Mother claims that there was legally and factually insufficient evidence to show that the parties' incomes or financial situations had changed since the MSA.

In many ways, we have already resolved this issue, as the financial-support modification appears to have been premised entirely on the simultaneous custody modification. And because we have already held that the custody modification was an abuse of discretion, the financial-support modification cannot rely on that premise.

But even if we were to treat the financial-support issue as a separate modification, it could not stand on its own. At trial, Father did not argue that the parties' incomes had changed since the MSA, nor did he attempt to prove as much. On the contrary, to the extent that Father sought to establish Mother's income at the time of trial, he did so primarily by pointing to evidence of her income while she was with Estranged Husband—before the MSA. And as for Father's income at the time of trial, the only evidence on the subject was Mother's memory of and an exhibit referencing "prior testimony." Whether the amount listed in Mother's exhibit differed from Father's income at the time of the MSA was never discussed. The same was true for Peter's medical and dental expenses: the topics were never discussed.

So whether viewed as a separate modification or a modification contingent on the change in custody, the financial-support modification was an abuse of discretion. We sustain Mother's second issue.

## D. Arrearages

Finally, Mother challenges the legal and factual sufficiency of the only remaining portion of the judgment: the orders that she pay $1,140 in past-due child support and $420.52 in past-due medical expenses. Mother argues that there was insufficient

evidence of the amounts she owed, while Father insists that Mother admitted her failure to make all of the required payments.

Mother indeed admitted her failure to make all of the required temporary-child-support payments, but such admission says nothing of the amount. The temporary orders required Mother to pay child support of $288.22 per month beginning on April 1, 2023, and at trial, there was no evidence identifying the precise dollar figure that Mother failed to pay or the number of payments she missed. Neither Mother nor Father testified to any such amount, and when Mother was asked, she stated that she "d[id]n't know the exact number."

As for past-due medical expenses, there was no evidence whatsoever on the subject. In fact, it is unclear what the awarded expenses were for, when they were incurred, whether Mother received notice of the expenses,[25] or anything of the kind—the topic was not even broached.[26]

Because there was factually insufficient evidence of the amount of Mother's past-due child support and legally insufficient evidence of her past-due medical expenses, the trial court abused its discretion by ordering Mother to pay these arrearages. We sustain Mother's third issue.

---

[25]Both the MSA-based order and the temporary orders required Mother to pay half of unreimbursed medical or dental expenses within a certain amount of time after Father provided notice of the expense with accompanying documentation.

[26]On appeal, Father does not address the medical expenses or point to any trial evidence supporting that portion of the judgment.

### III. Conclusion

The trial court abused its discretion by modifying the MSA-based order without factually sufficient evidence of a material and substantial change, by requiring Mother to pay past-due child support without factually sufficient evidence of the amount owed, and by requiring Mother to pay past-due medical expenses with no evidence of such expenses. We reverse the modification judgment in its entirety and remand the case for a new trial.[27] Tex. R. App. P. 43.2(d); *see Guevara*, 247 S.W.3d at 670 (recognizing that, if there is evidence to support some but not all damages and a remittitur cannot be determined, then remand is appropriate); *R.R.K.*, 2022 WL 1257136, at *15 (remanding for new trial on certain SAPCR modifications after holding evidence factually insufficient to support corresponding material-and-substantial-change finding).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 13, 2025

---

[27]Although there was no evidence of past-due medical expenses, and although we generally "render judgment when a no[-]evidence issue is sustained following a trial on the merits," *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007), Mother does not request rendition on the arrearage award. She argues that the arrearage award "should be reversed" then concludes with a general prayer "ask[ing] the [c]ourt to reverse[] and remand this case." *See* Tex. R. App. P. 38.1(j) (requiring appellant to "clearly state[] the nature of the relief sought"). "A party generally is not entitled to relief it does not seek." *State v. Brown*, 262 S.W.3d 365, 370 (Tex. 2008); *see Zaidi v. Shah*, 502 S.W.3d 434, 446 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (discussing the "rule that appellate courts can grant less relief than requested[] but cannot grant more relief than requested").